7 F.3d 1006
 RESOLUTION TRUST CORP., Plaintiff,
v.
DUNMAR CORP. and MICHAEL D. JONES, Defendants-Counterclaim Plaintiffs,
THE FIRST F.A., Defendant-Counterclaim Defendant,
SHERMAN DANTZLER and JACK SHIREK, Defendants,
and
THE FIRST F.A. OF ORLANDO and RESOLUTION TRUST CORP.,
Counter-Defendants.
Michael D. JONES, Robert S. Guskiewicz, R.S. Futch, Jr.,
Plaintiffs-Appellants,
v.
RESOLUTION TRUST CORP., Defendant-Third Party Plaintiff-Appellee,
Philip Donlevy, William Crawford, Robert Stone, Defendants,
v.
SEMINOLE FLYING AND SOARING, INC., and The First F.A. of
Orlando, Third Party Defendants.
RESOLUTION TRUST CORP., Plaintiff-Counter-Defendant-Appellee,
v.
LAKE PICKETT, LTD., a Florida Limited Partnership; Michael
D. Jones, as general partner, d/b/a Lake Pickett, Ltd., a
Florida Limited Partnership; Michael D. Jones, individually
and as Trustee, Defendants-Counter-Plaintiffs-Appellants,
The First F.A. of Orlando, Defendant.
 No. 91-3924.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 23, 1993.
 
 Brenda Lee London, Robert D. Gatton, Broad and Cassel, Maitland, FL, for appellants.
 E. Givens Goodspeed, Giles, Hedrick & Robinson, P.A., Orlando, FL, Kirk K. Van Tine, Baker & Botts, Washington, DC, for appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY and ANDERSON, Circuit Judges, and RONEY, Senior Circuit Judge.
 FAY, Circuit Judge:
 
 
 1
 The appellants, Michael D. Jones, et. al. appeal summary judgment rendered by the district court in favor of the Resolution Trust Corporation ("RTC") in two cases which were consolidated for appeal. The district court held that all of Jones' claims were precluded by the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e). Because we find the D'Oench, Duhme doctrine does not apply to the majority of Jones' claims[1] against the RTC as Receiver, we REVERSE the district court's grant of summary judgment with respect to those claims. We AFFIRM the district court's order granting summary judgment to the RTC in its corporate capacity, albeit on different grounds.
 
 Standard of Review
 
 2
 Grants of summary judgment are subject to de novo review and this Court applies the "same legal standards that control[led] the district court's determination...." First National Life Ins. Co. v. California Pacific Life Ins. Co., 876 F.2d 877, 881 (11th Cir.1989). Although review of a summary judgment usually focuses on whether there are disputed issues of material fact,[2] in this case the district court ruled as a matter of law that Jones' claims were barred. Therefore, our review is more akin to the review of a dismissal for failure to state a cause of action or a judgment on the pleadings,[3] because the dispute is whether there can be any right to assert the claim in the first instance. Given this posture, we must assume that the material allegations of the complaint are true and construe all inferences arising therefrom in Jones' favor. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1974). See also Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir.1992) (on motion to dismiss for failure to state a cause of action court must "take as true" "all well pleaded" facts alleged in a complaint).
 
 PART I
 
 3
 The issue in this case is whether a borrower of a failed financial institution may ever have a valid claim, which involves his loans, against the institution once it is in the hands of the federal regulators. Jones claims he was injured by the tortious conduct of the now defunct bank's employees with regard to two proposals to purchase properties the bank held as security for two of his loans--conduct he claims caused the proposals to fall through and led to his losses. Moreover, he attempts to hold the RTC responsible for this allegedly tortious conduct on the part of the bank's employees because he asserts that the regulators were, in effect, controlling the institution during the relevant period. Stated another way, he attempts to apply principles of agency law to hold the federal regulators vicariously liable for the allegedly tortious conduct of the bank's employees. These claims are asserted against the RTC in both of its capacities.
 
 
 4
 In response, the RTC in its corporate capacity, as holder of Jones' notes, seeks to foreclose on the subject properties and asserts that Jones' claims are barred by the D'Oench Duhme doctrine and 12 U.S.C. § 1823(e). Both the doctrine and the statute prohibit a party from bringing claims, or raising defenses, which arise out of secret, unrecorded or oral agreements. The RTC argues that, not only do these laws bar Jones' claims as defenses to its foreclosure action, it also argues that D'Oench and § 1823(e) prevent Jones from bringing these claims against the RTC as receiver for New Freedom. The question is whether tort claims, which do not challenge the validity of an obligation, are barred by either the doctrine or the statute which address "agreements."
 
 FACTS
 Background
 
 5
 Michael Jones was a borrower of the twice defunct Freedom Savings & Loan Association. His relationship with the bank began in 1978 with the institution then known as ComBank, which was later acquired by, or merged with, Freedom. Exhibit Vol. R1-51-18-19. (Deposition of Michael D. Jones). Over the years Jones obtained several personal and business loans from Freedom, two of which are involved in the instant case.[4] The first loan was secured by a mortgage on a residential real estate development known as Pickett Downs ("Lake Pickett"). Id. at 31-33. The collateral for the second loan consisted of property which Jones and his partners apparently intended to develop as a "fly-in" residential community with an airstrip ("Airport Property"). Id. at 85-88.
 
 
 6
 On July 23, 1987, over a year after the last of these loans was made, the Federal Home Loan Bank Board ("FHLBB") declared Freedom insolvent and appointed the Federal Savings & Loan Insurance Corporation ("FSLIC") as Receiver for what will henceforth be referred to as "Old Freedom."[5] The FHLBB simultaneously chartered a new federal savings and loan institution with the same name as the old one, which, for purposes of distinguishing the two, shall be referred to as "New Freedom." The FSLIC then transferred some of the assets of Old Freedom, including the loans at issue, to New Freedom under an acquisition agreement. At the same time, FSLIC, through New Freedom, contracted with The First, F.A. of Orlando ("The First"), another financial institution in the area,[6] to provide management services to New Freedom. Pursuant to this management agreement, Jack Shirek, Executive Vice President and Chief Operating Officer of The First, was made President of New Freedom. The FSLIC also agreed to indemnify The First against various potential liabilities that might arise in discharging the contract. In addition, FSLIC removed the board of directors of New Freedom and replaced them with its own candidates. From this point forward New Freedom was ostensibly a new, independent institution. However, it continued to operate under extremely close supervisory control from FSLIC and the FHLBB. In particular, New Freedom could not extend or renew loans in excess of two million dollars without the approval of the regulatory authorities in Atlanta. Moreover, a representative of the regulators attended the board meetings, to observe, if not to advise, the board on its decisions.[7]
 
 The Deals
 
 7
 Some time after the creation of New Freedom, between February and May of 1988, Jones and his partners were approached with offers to purchase the Lake Pickett and Airport properties. It is the bank's alleged mishandling and malfeasance with respect to the subsequent negotiations regarding these offers to purchase that form the basis of Jones' claims.
 
 The Lake Pickett Property
 
 8
 In February of 1988, Jones says he was approached by a group of builders interested in buying the Lake Pickett property. According to Jones, he discussed the purchase with Steve Chitwood, a broker representing some of the other builders of the Pickett Downs project, and Terry Hagen, a builder who owned several lots in Phase IV of the development. Jones alleges he reached a tentative agreement with Hagen and Chitwood that the buyers could have the property for $150,000 plus assumption of the mortgage held by New Freedom. The mortgage balance at that time was approximately $850,000. After this agreement was reached, Hagen and Chitwood went to New Freedom to verify the bank would permit an assumption. They met with Robert Stone, one of the defendants in this suit, who was then an officer of New Freedom.
 
 
 9
 Jones claims that at this meeting Stone told the prospective purchasers that Jones was about to go into default on some other loans, in which case all of Jones' loans would be declared in default because they were cross-collateralized. He further claims that Stone told Hagen and Chitwood that the bank would be willing to sell the property for a discounted price of $640,000.[8] Jones asserts that New Freedom's offer to sell the property at a discount, along with the information concerning the status of his other loans (which he says was erroneous) caused the proposed sale to fall through. He claims the buyers backed out because they now believed they could save approximately two hundred thousand dollars by simply waiting until New Freedom foreclosed and then purchasing the property at a lower price.
 
 The Airport Property
 
 10
 In April of 1988 the Euro-American Investor Group ("Investor Group") expressed an interest to Jones and his partners in purchasing the Airport Property. The Investor Group, however, wanted some zoning changes approved before they would be willing to buy. Jones claims he had previously contacted New Freedom, concerning a different proposed sale which included the same zoning changes, and was assured by Fred Lazard,[9] formerly a senior vice president of the bank, that the bank would be cooperative and flexible regarding the maturity of the loan because the proposed zoning changes would enhance the property's value, benefitting all concerned. Thus, Jones says he believed the Investor Group's condition was not a problem. Nevertheless, he contacted New Freedom to confirm his previous understanding with Lazard and discovered Lazard was no longer employed by New Freedom.
 
 
 11
 Instead, he met with defendant Philip Donlevy, a senior vice president at New Freedom. Donlevy told Jones that he did not have the authority to make any decisions on extensions of this size. He indicated Jones should speak to William Crawford, Donlevy's superior and another defendant in this case. Crawford told Jones that he would need Jones' proposal in writing before he could take any action on it, but that Lazard's representations would be honored as long as Jones and the other borrowers honored their part of the deal. Jones claims that he left this meeting with the impression that New Freedom would not stand in the way of any sale or assumption by the Investor Group by immediately calling his note at maturity.
 
 
 12
 On approximately May 20, 1988 Donlevy, representing New Freedom, met with Jones and two of the principals in the Investor Group, Allan Keen and A.C. Leerdam. At this meeting Keen and Leerdam expressed to Donlevy a need to have their proposal approved no later than June 15, 1988 because Leerdam was leaving the country and needed a commitment from New Freedom to allow the assumption in order to obtain the commitment to the project from Leerdam's investors in Europe. Once again, Donlevy claimed the bank would need a written proposal of the deal. The Investor group submitted their written proposal to New Freedom on approximately the 23rd of May.
 
 
 13
 At some point during, or shortly after, these meetings, Jones claims Jack Shirek became aware of the proposed sale of the Airport Property to the Investor Group and conceived a plan to frustrate and delay approval of the proposal. The principals of the Investor Group were well known to, and good customers of, The First. According to Jones, were it not that assumption of the existing mortgage would be cheaper than seeking alternate financing, the Investor Group would have approached The First for the new loan. Jones claims, Shirek and The First conceived a plan to frustrate the proposed assumption, to delay the sale and force Jones into foreclosure with the intent to gain a benefit for The First. After foreclosure The First could step in, either to offer the financing itself, or to acquire the property at a discount and then resell it to the Investor Group at a profit.[10]
 
 
 14
 Whatever Jack Shirek's plans may have been, on May 27, 1988, the board of directors of New Freedom met and considered the proposal submitted by the Investor Group. That proposal was rejected. Jones claims that it was rejected at Shirek's suggestion. He also claims that the board further decided that day not to permit an assumption under any circumstances--again at Shirek's direction. In spite of the fact that this second alleged decision by the board foreclosed the possibility of an assumption, Jones claims that Crawford and Donlevy continued to act as if an assumption would be permitted by continuing to ask for revised proposals and additional documents from the Investor Group and Jones. He claims that these misrepresentations were made knowingly, at the direction of Shirek, and with the intent to delay any sale long enough to call Jones' loans and put him into foreclosure.
 
 
 15
 As of early June, the Investor Group and Jones were continuing to attempt to get an approval of the assumption, unaware that no such assumption would be approved. On June 3rd a tentative oral agreement was reached between Crawford and Leerdam regarding the Investor Group's assumption of the existing mortgage. Crawford allegedly told Leerdam the agreement was subject to the final approval of the board of directors. He represented that the board could be polled by telephone and could give Crawford an answer by that afternoon which he would relay to Leerdam. Apparently though, no one heard further from Crawford that day although Jones and Leerdam say they made numerous attempts to reach him. On June 6th, Jones finally reached Crawford and was told the Board had rejected the second proposal for an assumption, but that he was still waiting to hear from the Investor Group concerning any revised proposals.
 
 
 16
 In fact, Jones asserts, Crawford had never presented the deal he discussed with Leerdam to the board, or informed any other senior officers at New Freedom of its existence. Nor, claims Jones, had Crawford ever contacted Leerdam or the Investor Group concerning the proposal as he had indicated to Leerdam he would. Moreover, when on June 7th Leerdam finally spoke to Crawford, after five attempts to reach him, Crawford allegedly told Leerdam there were "problems with the sellers" and he needed forty-eight hours before he could give Leerdam an answer. At this, Leerdam testifies he knew the deal was "impossible." Jones asserts Crawford's representations were false. The only "problem," Freedom had with Jones was it needed time to complete the steps necessary to call his loans and put him into foreclosure to "kill the deal." Jones asserts that all of the misrepresentations and delays were made at Shirek's direction.
 
 
 17
 On June 3rd, while Leerdam and Jones were attempting to ascertain the status of the proposed assumption, New Freedom, through Shirek, was taking steps to call Jones' loans. On or about that day Jones's loans were packed up and transferred to the Special Assets Division, the loan workout group. He also claims that about this time Shirek directed the letters of credit securing the interest on the Airport Property be drawn upon. On June 6, 1988 New Freedom drew drafts on the letters of credit and caused them to be presented and paid. Later that month Jones and the Investor Group met with New Freedom representatives, at which time Jones claims he and the buyers first learned of the board's May 27th decision to not permit an assumption under any circumstances. New Freedom called Jones' loan and he filed suit against the bank.[11]
 
 THE PROCEDURAL HISTORY
 
 18
 Jones sued New Freedom and various of its officers in state court on a number of tort theories. New Freedom responded by instituting foreclosure proceedings on the subject properties. Before the cases were resolved, on February 7, 1989, the FHLBB declared New Freedom insolvent and appointed FSLIC as Conservator.[12] On March 8, 1989 FSLIC, as Conservator for New Freedom, removed all of these cases to federal court. To further complicate matters, in 1989 the Congress passed FIRREA, one of the elements of which was to dissolve FSLIC and the FHLBB and create the RTC. See supra footnote 6. Thus, the RTC as Receiver for New Freedom Savings and Loan, now stands in the shoes of New Freedom with respect to Jones' claims against the bank. The RTC in its corporate capacity, as the purchaser of the assets of New Freedom, takes over the claims against Jones on the notes.[13]
 
 Case Number 89-207-CIV-ORL-19
 
 19
 In the first lawsuit Michael D. Jones, and his partners in the Airport Property, Robert S. Guskiewicz and R.S. Futch, Jr., sued Freedom Savings and Loan Association, various officers of Freedom, The First, and Jack Shirek. The complaint contains seven counts.[14]
 
 
 20
 (1) Breach of Fiduciary Duty
 
 
 21
 (2) Intentional and Unjustified Interference with Contractual or Business Relationships
 
 
 22
 (3) Breach of Duty Not to Disclose Information Concerning Depositor's Accounts
 
 
 23
 (4) Negligent Misrepresentation/Fraud
 
 
 24
 (5) Intentional Interference with an Advantageous Business Relationship
 
 
 25
 (6) Declaratory Judgment that the notes the RTC seeks to collect are unenforceable or void
 
 
 26
 (7) Negligent Supervision
 
 
 27
 The RTC counterclaimed seeking foreclosure on the Airport Property based on failure to pay the promissory note when due.
 
 Case Number 89-208-CIV-ORL-18
 
 28
 In the second case, the RTC sued Lake Pickett, Ltd. and Jones, in his capacity as General Partner of Lake Pickett, Ltd., to foreclose on the Lake Pickett property due to non-payment. In response, Jones filed a third party complaint which mirrors the above complaint.
 
 PART II
 Duhme and Gloom: RTC as Receiver
 
 29
 For decades the D'Oench, Duhme doctrine has proved the nemesis of borrowers seeking to escape repayment of their loans from failed institutions. And in the wake of the crisis of bank failures in the last decade, a crisis which continues into the present, the shadow it casts on their claims has grown ever longer. The doctrine prevents borrowers from raising oral, secret or otherwise undocumented agreements as a defense to actions by the RTC to collect on promissory notes of failed institutions, or to assert such agreements as the basis of a claim against the RTC. Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1515 (11th Cir.1991) cert. denied --- U.S. ----, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992). D'Oench involved a secret agreement not to collect on a promissory note which was given solely to prevent the bank's books from reflecting a loss which it otherwise would have shown. D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 454, 62 S.Ct. 676, 678, 86 L.Ed. 956 (1942). This ruling was predicated on the policy that the bank examiners, who seek to insure the integrity of our banking system, ought to be able to rely on a bank's records. D'Oench at 460, 62 S.Ct. at 680-81. The federal authorities also need reliable information with which to decide how to handle the remaining assets of an insolvent institution, secure in the knowledge that these assets will not disappear in a flurry of alleged secret agreements not to collect.
 
 
 30
 Congress codified the D'Oench doctrine in 12 U.S.C. § 1823(e) which reads:
 
 
 31
 No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section ..., either as security for a loan or by purchase or as receiver of any insured depository institution,[15] shall be valid against the Corporation unless such agreement--
 
 
 32
 (1) is in writing,
 
 
 33
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 
 
 34
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 
 
 35
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
 
 
 36
 12 U.S.C. § 1823(e) (emphasis added). Undoubtably, D'Oench and § 1823(e), taken together, cut off a number of the claims or defenses which could have otherwise been asserted against the institution prior to insolvency. The question is whether the statute and the doctrine together cut off all claims. We think, by virtue of the plain meaning of the language, they do not.
 
 
 37
 In order to determine if the district court correctly analyzed whether D'Oench applies to this case we must first clarify what Jones is not claiming. In the original order granting partial summary judgment the district court noted: "The Jones parties have not raised any issue of fact as to the authenticity of the notes, mortgages, and credit card accounts involved in any of these actions, or as to the amount due upon the face of these instruments...." R5-83-8 (Order of June 8, 1990) (emphasis added). Thus, Jones does not claim the loans are invalid because they were fraudulently induced. He does not disclaim executing the notes.[16] He does not dispute the amount due.
 
 
 38
 Furthermore, none of his claims sound in contract. He does not seek to prove the existence of an "agreement." He does not claim that New Freedom breached an enforceable oral contract to extend or otherwise modify his loans. He does not claim that New Freedom breached a contract, to which he was a known third party beneficiary, with his potential buyers to allow assumption of the loans. Instead, Jones claims that the bank officers breached their fiduciary duty of non-disclosure, and that the unauthorized disclosures, negligence, and misrepresentation caused him injury by frustrating the sale of the property which secured the promissory notes on which the RTC seeks to collect. The specific acts alleged are a mixed bag of non-feasance, misfeasance and malfeasance. In short, his claims sound in tort.
 
 
 39
 We have already held, in contrast to some circuits, see, e.g., Timberland Design v. First Service Bank for Savings, 932 F.2d 46, 50 & n. 4 (1st Cir.1991), that D'Oench does not operate "to bar free standing tort claims ... not related to a specific asset acquired by the FDIC." Vernon v. Federal Deposit Ins. Corp., 981 F.2d 1230, 1233-34 (11th Cir.1993). Accord Astrup v. Midwest Federal Savings Bank, 886 F.2d 1057, 1059 (8th Cir.1989); Commerce Federal Sav. Bank v. Federal Deposit Ins. Corp., 872 F.2d 1240, 1244 (6th Cir.1989). "Related to" in this statement means a cause of action against or challenging the obligation. The thrust of both D'Oench and 12 U.S.C. § 1823(e) is to negate claims or defenses attacking the validity of an obligation by virtue of some "agreement."[17]
 
 
 40
 Jones is not seeking to enforce any secret or unwritten "agreement" so it is difficult to see how D'Oench or § 1823(e) could apply to his claims. No one is likely to memorialize an agreement or intention to commit a tort. Nor does the commission of a tort have any bearing on the validity of an institution's assets as recorded such that the bank examiners are likely to be misled, the issue that concerned the Supreme Court in D'Oench. Although this may seem to be an artificial distinction, it is one that appears to be compelled by the language of the statute. Moreover, as we discuss below, while it would certainly be consistent with the rest of congressional policy as expressed through the FIRREA if we were to decide that the RTC as receiver for a defunct institution is simply not subject to the tort claims of those who deal with it, that is not what § 1823(e) says, and we think it an unwarranted extension of the language to engraft that reading upon either D'Oench or § 1823(e). Jones' claims with respect to the RTC in its corporate capacity are a different matter.
 
 PART III
 Liability of RTC in its Corporate Capacity
 
 41
 Jones attempts to argue that, because the federal regulatory authorities exerted so much control over the institution, its employees, and its agents, The First and Jack Shirek, were all merely agents of the federal regulators. On that question there was a great deal of debate in oral argument as to whether the evidence in the record established that FHLBB or FSLIC had dominion and control over New Freedom such as to establish an agency relationship. From a factual standpoint the regulators certainly exerted such control over New Freedom that, outside of the regulatory environment, New Freedom might have been deemed its agent. See Colon v. Operation South, Inc., 597 So.2d 364, 365 (Fla.Dist.Ct.App.1922) (agent's "authority may be conferred in writing, orally, or it may be inferred from a given set of facts.").[18] This is because New Freedom was, in essence if not technically, a bridge bank. See 12 U.S.C. § 1821(n).[19]
 
 
 42
 Section 1821(n) authorizes the Federal Deposit Insurance Corporation (FDIC) to create "bridge banks" out of institutions which it deems to be in default or that it anticipates will be in default.[20] 12 U.S.C. § 1821(n)(1)(A).[21] Bridge banks are creatures of statute. A bridge bank serves as a vehicle to smooth the transition of a failed institution so that the FDIC need not immediately put an institution into receivership and pay out on insured deposits if there is a possibility that a buyer for the assets may emerge.[22] It is a temporary institution.[23]
 
 
 43
 In taking control of a failed bank and creating a bridge bank, the FDIC is empowered to: (1) "assume such deposits of such insured bank or banks ... as the Corporation may, in its discretion determine to be appropriate ...,"; (2) assume such other liabilities ... as the Corporation may, in its discretion, determine to be appropriate;" (3) "purchase assets"; and (4) "perform any other temporary function[24] which the Corporation may, in its discretion, prescribe in accordance with this chapter." 12 U.S.C. § 1821(n)(1)(B)(i)-(iv).
 
 
 44
 The powers of the FDIC and the RTC are extensive with respect to bridge banks. They have virtual control of the institution, and complete control and approval powers over all major decisions.[25] In spite of this control, 12 U.S.C. § 1821(n)(6)(A) states unequivocally: "A bridge bank is not an agency, establishment, or instrumentality of the United States." Id. (emphasis added). In other words, the bridge bank is not an extension of the FDIC or RTC and the regulators cannot be held vicariously liable for any negligence in the administration or operation of a bridge bank. Holders of claims are limited to the assets of the bridge bank.
 
 
 45
 There is no question that the regulators exerted a similarly high degree of control over New Freedom in this case. Nevertheless, consistent with the statutory exclusion of liability in § 1821(n)(6)(A), the Supreme Court has held the regulatory agency cannot be held liable for any negligence in the performance of its regulatory duties to the extent those duties are exercises of its discretionary functions.[26] United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Furthermore, in Gaubert the Court held that the type of functions performed by FSLIC in this case were discretionary.
 
 
 46
 Gaubert was the former chairman of a defunct savings and loan sued the United States under the Federal Torts Claim Act (FTCA) for injuries he said he suffered in connection with the allegedly negligent supervisory actions of the FHLBB. The FHLBB had asked, (without even having declared the institution insolvent) for Gaubert to remove himself from the board of directors, and to post a $25 million dollar interest in real property as security for his personal guaranty that the bank's assets would exceed regulatory minimums. Thereafter, the FHLBB required the members of the board of directors to resign and replaced them with its own candidates. Id. at 319, 111 S.Ct. at 1272. It recommended the hiring of "a certain consultant to advise [the bank] on operational and financial matters," "mediated salary disputes," and generally "became more involved in [the bank's] day-to-day business." Id.
 
 
 47
 In spite of this high degree of involvement in the bank's management, a degree arguably as high or higher than in this case, the Supreme Court held the FHLBB was not liable in tort for any negligence in the operation of the bank because its actions fell into the "discretionary functions" exception to the FTCA. Gaubert at 325-34, 111 S.Ct. at 1275-80. The Court found that the FHLBB's involvement in the day-to-day operation of the bank did not mean that its actions were "operational" and not the product of discretion exercised in accordance with some policy objective. Id. at 332, 111 S.Ct. at 1278-79.
 
 
 48
 What Jones is attempting to do, by arguing that an agency relationship existed between FSLIC and the employees of New Freedom and The First, is to arrive indirectly at what Gaubert attempted to do directly--that is hold the United States liable in tort for the alleged negligence of New Freedom's employees. The Supreme Court's decision in Gaubert makes clear that no such liability will be imposed on the federal banking regulatory agencies in the conduct of their responsibilities. We sympathize with Jones' plea that the regulators be held to some standard of accountability for the actions they take in such circumstances. Certainly this case illustrates the difficulties posed for borrowers when their banks fail. It also calls into question the efficacy of some of the regulators practices. Nevertheless, Congress and the Supreme Court have stated unequivocally that no such accountability will be imposed on the United States as a result of its regulatory activities in this area. It is not difficult to understand why given the magnitude of the banking crisis. Thus, Jones' claim against the RTC in its corporate capacity fails and it is entitled to summary judgment on the notes. Jones is limited to asserting his claim against the RTC as Receiver, because it stands in the shoes of New Freedom. If he succeeds, Jones will not be able to collect any more than the amount to be determined by the RTC pursuant to the statute.
 
 CONCLUSION
 
 49
 For the foregoing reasons we REVERSE the summary judgment in favor of the RTC in its capacity as Receiver for New Freedom, except with regard to Count Six. The judgment as to Count Six in both cases is AFFIRMED. The district court's order with respect to the RTC in its corporate capacity, and in every other respect, is AFFIRMED.
 
 
 50
 ANDERSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 51
 To the extent that the court affirms the judgment of the district court, I concur; however, I respectfully dissent from that portion of the majority opinion which reverses the judgment of the district court. There are at least two aspects of the majority opinion with which I disagree.
 
 
 52
 First, so far as I understand the facts of this case, and also the language of the majority opinion, I can discern no difference--i.e., a difference which has legal significance in the application of the D'Oench[1] bar--between the claims which the majority opinion permits to proceed and the claims which the majority opinion holds are D'Oench-barred. To the best of my understanding, the claims are identical. The claims differ only in two respects, neither of which has legal significance with respect to the application of the D'Oench doctrine. The permitted claims are asserted against RTC in its capacity as receiver, while the barred claims are asserted against RTC in its corporate capacity. The law is well established, and the majority opinion does not suggest otherwise, that the D'Oench bar applies in both capacities,[2] and thus this is not the distinction which the majority is drawing. The only other difference I can discern is that the barred claims were asserted in the context of defenses to the effort of RTC to collect on a note, while the permitted claims were asserted as claims in the nature of a setoff. However, the majority opinion does not suggest that this fact carries legal significance, and I am aware of no case law suggesting that the D'Oench bar applies only to bar defenses to a note.[3] Therefore, this cannot be the distinction that the majority is drawing. Thus, the only differences which I can discern between the claims that the majority permits to proceed and the claims that the majority holds are D'Oench-barred are differences which have no legal significance. The majority opinion does not suggest that these two differences have any legal significance; rather, the majority opinion indicates that the reason for its refusal to apply the D'Oench bar is that the claims at issue are tort claims. However, if it is true that the tort claims at issue here are not D'Oench-barred, as the majority holds in one part of its opinion, then I cannot understand why the majority holds in another part of its opinion that those same claims are D'Oench-barred when asserted as a defense to the effort to collect on the note.
 
 
 53
 Second, and wholly apart from the apparent logical inconsistency, above discussed, I respectfully disagree with the rationale of the majority opinion that the D'Oench doctrine does not bar tort claims.[4] In my judgment, the Supreme Court has held that the D'Oench doctrine does bar tort claims. In Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court applied 12 U.S.C. § 1823(e) (codifying the D'Oench doctrine) to bar a claim based upon an oral misrepresentation by a banking official, notwithstanding the fact that the claim sounded in tort. The claim was for fraud; that is, that the misrepresentation was fraudulently made. In Langley, the alleged fraudulent misrepresentations were made during discussions which were part of ordinary banking transactions and which culminated in a land purchase, a note and a mortgage.
 
 
 54
 Similarly in this case, the misconduct of which Jones complains involves negotiations and discussions concerning the bank's approval of persons or entities to assume part of Jones' mortgage indebtedness. It is apparent from the statement of facts in the majority opinion that Jones' claims are based upon negotiations between the bank officials, on the one hand, and, on the other hand, Jones and the persons proposing to purchase Jones' property and assume Jones' indebtedness with the bank. The background of Jones' claim is that Jones wanted to sell the property and needed to do so to escape the burden of the debt, that Jones had potential purchasers who were willing to assume Jones' indebtedness, and that certain concessions by the bank were needed including in particular the bank's approval of the assumption by the potential purchasers. It is clear to me, from the facts recited by the majority, and from the briefs and the complaints, that the gist of Jones' claim is that the bank officials strung him along, leading him to believe that the bank's approval would be forthcoming, and then pulled the rug out from under Jones' feet by refusing at the last minute to approve assumption of the loans. This case is analogous to Langley in that the instant tort claims are intertwined with oral representations which Jones asserts led him to believe New Freedom would permit assumption of his mortgage indebtedness.
 
 
 55
 The First Circuit has also squarely rejected the position adopted today by the majority:
 
 
 56
 This conclusion is not altered by the fact that some of the claims asserted by Timberland sound in tort. The district court correctly held that D'Oench bars defenses and affirmative claims whether cloaked in terms of contract or tort, as long as those claims arise out of an alleged secret agreement.... To allow the plaintiff to assert tort claims based on the oral agreement would circumvent the very policy behind D'Oench, and therefore, D'Oench is generally said to apply to tort claims. See Beighley [v. Federal Deposit Insurance Corporation], 868 F.2d at 784. Although not decided under D'Oench, the Supreme Court's decision in Langley v. FDIC supports this conclusion by holding that § 1823(e) bars fraud claims that are premised upon an oral agreement. 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987). We therefore conclude that D'Oench applies with equal force to tort claims arising out of secret agreements.
 
 
 57
 Timberland Design, Inc. v. First Serv. Bank for Sav., 932 F.2d 46, 50 (1st Cir.1991) (footnotes omitted). The tort claims asserted in Timberland (negligent misrepresentation, deceit, and breach of fiduciary duty) arose out of negotiations concerning additional loans, a context analogous to the claims in this case.
 
 
 58
 A number of other courts have held that D'Oench bars tort claims in similar situations. See McCullough v. FDIC, 987 F.2d 870 (1st Cir.1993) (D'Oench barred claim that bank liable for failing to disclose order requiring removal of hazardous waste from property); Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571 (10th Cir.1993) (D'Oench barred tort claim arising out of misrepresentations made during contract negotiations); In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332 (1st Cir.1992) (tort claims based on illegal kickback scheme barred by D'Oench); Oliver v. Resolution Trust Corp., 955 F.2d 583 (8th Cir.1992) (D'Oench barred tort claim for breach of fiduciary duty based on violation of oral side agreements regarding loan).[5]
 
 
 59
 It might be argued that Astrup v. Midwest Federal Sav. Bank, 886 F.2d 1057 (8th Cir.1989), supports the majority's position in this case. In that case, Golden Pine was a subsidiary of First Federal Savings & Loan Association. First Federal (the bank) was prohibited by relevant regulations from engaging in real estate development; therefore the real estate project at issue was undertaken by its subsidiary, Golden Pine. Golden Pine and Astrup entered into a joint venture involving development of a 36-unit condominium project. The bank held the mortgage on the property. The notes and mortgage held by the bank called for interest at the market rate, but Astrup apparently claimed that Golden Pine, acting as the bank's alter ego, was to provide financing at rates below the market. Id. at 1058 n. 2. Apparently, Astrup also asserted that Golden Pine agreed to assume Astrup's portion of the mortgage, and that Golden Pine breached its fiduciary duty to Astrup, as a joint venturer, by fraudulently entering into a transaction involving discriminatory interest rates. Id. at 1059-60. There was a jury verdict against Golden Pine. The district court granted a judgment notwithstanding the verdict with respect to the contract claims; the Eighth Circuit, relying upon the D'Oench doctrine, affirmed. However, the district court denied judgment notwithstanding the verdict with respect to the tort claims. The Eighth Circuit also affirmed this ruling, stating that the D'Oench doctrine affords no protection against tort claims, whether for personal injuries in an automobile collision, or for securities violations, "or for fraudulently entering into transactions involving discriminatory interest rates, such as the agreements alleged by plaintiff in the case at bar." Id. at 1060. I note that the Eighth Circuit cited no precedent for its holding.
 
 
 60
 It would also appear that Astrup is distinguishable from the instant case; unlike this case, Astrup did not involve a tort arising out of ordinary banking transactions. Rather, in Astrup, the tort arose out of the nonbanking business operation conducted by Golden Pine. The business transaction was apparently structured in this manner precisely because the bank could not under the relevant regulations engage in the real estate development business. Indeed, the D'Oench policy itself derived from the "federal policy to protect ... the public funds which it [the federal banking authority] administers against misrepresentations as to the securities or other assets in the portfolios of the banks which respondent insures." D'Oench, 315 U.S. at 457, 62 S.Ct. at 679. That policy would not seem to be implicated at all in Astrup, because it seems clear that Golden Pine would have no depositors insured by the federal banking authority. By contrast, the tort claims in this case arise out of the discussions and representations allegedly made to Jones during negotiations concerning the assumption of Jones' indebtedness by potential purchasers of the collateral. Thus, I submit that Astrup provides no support for the majority's holding that the instant tort claims (which I submit are intertwined with oral discussions conducted during ordinary banking transactions) escape the D'Oench bar.
 
 
 61
 I also submit that it would undermine the purposes behind the D'Oench doctrine to fail to apply the doctrine here. First, it would undermine the purpose designed to permit bank examiners to rely on a bank's records in evaluating the fiscal soundness of the bank and in deciding how best to deal with a bank in trouble. It is clear to me that any obligation of New Freedom to permit assumption of the Jones mortgage is precisely the kind of banking obligation that one would reasonably expect to be reflected in the bank records. If appellants prevailed in the instant suit, the effect would be very similar to enforcing the alleged oral promise by New Freedom to permit assumption of Jones' mortgage indebtedness; the effect would be to impose liability notwithstanding the fact that no document in the bank's records evidenced a commitment concerning assumption of the mortgage. Second, failure to apply the D'Oench doctrine in this case would undermine the purpose designed to insure mature consideration of banking transactions by appropriate banking officials. Here, it is clear that the appropriate bank officials did not authorize assumption of Jones' mortgage indebtedness. Finally, it is also clear that Jones lent himself to an arrangement calculated to mislead bank examiners. Jones failed to obtain an official document, or any writing at all, evidencing a commitment to permit the mortgage assumptions which Jones sought.
 
 
 62
 The majority relies upon Vernon v. FDIC, 981 F.2d 1230 (11th Cir.1993). In that case, this court did hold that the D'Oench doctrine does not apply to "free standing tort claims." That case, however, involved a tort claim arising out of the sale of the bank's own stock; unlike the instant case, it did not involve a tort claim arising out of oral discussions and representations during ordinary banking transactions and with respect to which it would be expected that any obligation on the bank would appear in the bank records. See OPS Shopping Center, Inc. v. FDIC, 992 F.2d 306 (11th Cir.1993). By contrast, Jones' tort claims arise out of oral representations and discussions concerning assumption of loans and New Freedom's ultimate refusal to approve the assumption of Jones' indebtedness by persons whom Jones proffered as potential purchasers of property which comprised the collateral for Jones' mortgage. Any obligation on the part of the bank relating to assumption of mortgages would ordinarily be expected to be reflected in the records of the bank.
 
 
 63
 I respectfully submit that the majority's holding constitutes an unwarranted extension of Vernon. In my judgment, the majority has extended Vernon's "free standing" tort theory to a claim which I submit is not "free standing." The Vernon rule makes good sense. For example, when bank examiners conduct their periodic inspection of a bank's records concerning ordinary banking transactions, they would not expect to find a record describing and quantifying the bank's potential liability with respect to vehicular accidents, especially those not yet reported or subject to claim. Potential claimants know that they have the usual statute of limitations period to make such claims; the failure to do so immediately could not be said to facilitate any misleading of bank examiners. By contrast, to extend the Vernon rationale to this case would undermine the purposes underlying D'Oench.
 
 
 64
 It is not necessary in this case for me to define the precise line between a "free standing" tort which escapes the D'Oench bar under Vernon, and a tort which is sufficiently intertwined with oral representations made during ordinary banking transactions to be barred by D'Oench. It is clear from the Supreme Court's holding in Langley that a claim arising from a fraudulently made oral misrepresentation is barred. The only cases to date which have held a tort claim to be immune from D'Oench have involved claims which did not arise out of ordinary banking transactions.[6] Such claims are readily classified as "free standing" torts. Because the instant tort claims not only arise out of ordinary banking transactions but are also intertwined with and inseparable from alleged oral misrepresentations, they fall easily within the holding of Langley. Thus, I need not address or decide whether some tort claims might be sufficiently separable from any oral misrepresentations so that the D'Oench bar is escaped notwithstanding the fact that the tort arose out of ordinary banking transactions.[7]
 
 
 65
 I conclude that both the case law and the purposes of the D'Oench doctrine point forcefully to the application of the doctrine in this case. I respectfully dissent from the failure of the court to do so.
 
 
 
 [1]
 We affirm the district court with respect to Count Six of Jones' complaint and counter-claim as we find these counts are barred by D'Oench
 
 
 [2]
 Summary judgment is appropriate only if it is clear there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)
 
 
 [3]
 Our conclusion is reinforced by the wording of the district court's original order of June 8th. R5-83. In that order the court "DISMISSED for failure to state a claim" all of the plaintiffs' claims against the RTC in Case no. 89-207 (suit brought by Jones parties). Id. at 10
 
 
 [4]
 Although Jones suggests in his Notice of Appeal that he is also appealing the district court's ruling as to Case no. 89-205-CIV-ORL-19, that case is not properly before us because there was no final order entered. See R3-151-2 (Order of August 13, 1991--Entry of final judgment in favor of RTC in Case nos. 89-207 and 89-208)
 
 
 [5]
 The FHLBB and FSLIC were abolished by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, § 401 et seq., 103 Stat. 183, 354 (1989) (codified in scattered sections of 12 U.S.C.). The RTC has been substituted for these entities
 
 
 [6]
 In its brief the RTC refers to The First as "an experienced management team from private industry." Appellee's Brief at 3. This characterization fails to clarify that the "team" in question was drawn from a single competitor bank. One of Jones' principal complaints is that FSLIC brought in a competitor, and a potential purchaser of the assets of New Freedom, to manage the bank. In light of Jones' charge, the RTC's characterization appears evasive and tends to lend credence to Jones' complaint, rather than the opposite
 
 
 [7]
 None of these facts are in dispute. It is merely the legal significance of these facts which the parties dispute. In its brief the RTC acknowledges that a FSLIC representative attended board meetings. Appellee's Brief at 9. The RTC chides Jones, however, for "misstat[ing]" the testimony of Jack Shirek as to the level of FSLIC's involvement in New Freedom, id. at 8, and offers instances where Shirek denied that FSLIC's representative got involved in decision-making. The RTC fails to note that some of Mr. Shirek's statements it does not cite tend to support a greater level of involvement by FSLIC than the RTC appears willing to admit. For example, Shirek testified that some of the "forbearances that were asked of Freedom," by Jones and the prospective purchasers of the Airport property, needed "both board and FSLIC approval." R3-122-24, lines 22-23 (Deposition of Jack Shirek). In describing the approval process for a loan request, Shirek testified that, Freedom's "board would make a decision as to whether it would approve it and recommend it to FSLIC, and usually FSLIC could give some indication at that time because a representative also always attended every Freedom board meeting." Id. at 25, lines 20-24 (emphasis added). When asked whether the Freedom board of directors would submit even loan proposals which it had declined to FSLIC, Shirek responded, "[i]t would depend on whether or not the FSLIC representative wanted that." Id. at 26, lines 5-6
 
 
 [8]
 Hagen testifies in his deposition that, prior to the meeting with Stone, he had the impression that Freedom had problems with Jones personally. In fact, his impression that there were problems was a source of concern to him because, as a participant in the development project, his investment could be negatively affected by any failure of Jones' portion. He claims this was his motive in seeking to purchase an interest in Jones' portion. Exhibit Vol. R1-14-8 & 24. Hagen testifies that it was his impression that the disclosures and the discount were offered because the bank was out to get Jones. Id. at 9, 11-12, & 25
 
 
 [9]
 Mr. Lazard's name appears variously in the record as "Lazar" and "Lazard." We use the spelling that appears most often
 
 
 [10]
 Quite apart from whether Jones' allegations that Shirek took affirmative steps to injure him are true, according to Shirek's deposition testimony, it is true that The First was interested in some of New Freedom's assets
 When we were asked by the, basically the Federal Savings and Loan Insurance Corporation to take a management position with Freedom, we were interested in expanding by assuming some of Freedom's offices. We informed both the Atlanta office of the [FHLBB] and the Washington Office of [FSLIC] of our interest, and that one of the reasons we would be going into Freedom was particularly for that.
 Later on we submitted a bid for Freedom.
 R3-122-11, lines 15-24 (Deposition of Jack Shirek).
 
 
 [11]
 Jones sued New Freedom in state court for wrongfully drawing on the letters of credit before they were due. According to his Third Amended Complaint, he received a judgment in his favor against New Freedom, see Third Amended Complaint at 35, p 62, although we have not been able to find a copy of it in the record
 
 
 [12]
 The terms "conservator" and "receiver" seem to be used interchangeably with respect to the functions performed by both the FSLIC and RTC. For example, as to the first failure of Old Freedom, the RTC refers to FSLIC as being appointed "Receiver for Old Freedom." Appellee's Brief at 2. With respect to the failure of New Freedom, the RTC notes that FSLIC was appointed "Conservator for New Freedom." Id. at 3. Whatever may be the differences in the two functions, the parties have neither brought them to our attention, nor argued that they make a difference to the outcome. Moreover, pursuant to an order dated October 12, 1989, the Office of Thrift Supervision ("OTS"), the post-FIRREA entity which supplanted the FHLBB in some of its functions, replaced FSLIC as Conservator with the RTC as Receiver shortly after the enactment of FIRREA. R2-41-5 ("Exhibit A"). Thus, we will disregard any significance which might otherwise attach to the difference
 
 
 [13]
 Jones does not distinguish between the RTC as Receiver and the RTC in its corporate capacity. Indeed, he often does not distinguish between New Freedom and the RTC. See Third Amended Complaint at 2, p 4 ("For purposes of this Complaint, FREEDOM and the RTC shall be deemed synonymous."). For the reasons we discuss below this attempt to blur the distinction between the two is unavailing and his claims against the RTC in its corporate capacity fail
 
 
 [14]
 Not every count includes all of the defendants. Count Six is against the RTC only, and Count Seven is against only The First and Jack Shirek
 
 
 [15]
 The italicized language was added as a FIRREA amendment to the existing section. See Pub.L. 101-73, § 217(4), 103 Stat. at 256. By its terms this language makes 1823(e) applicable to the FDIC in both of its capacities, and therefore, to the RTC as well, by virtue of § 501 of FIRREA. Nevertheless, § 1823(e) still refers to "agreements," and subsections (1) through (4) make clear that this word refers to contracts
 
 
 [16]
 The sole claim that Jones makes which goes to the notes themselves is Count Six, the request for a declaratory judgment that the notes are unenforceable. Count Six is covered by D'Oench because it represents an attempt to tie Jones' claims against New Freedom to his liability on the notes. Whatever liability the RTC assumes in its capacity as receiver is independent from the RTC's claims on the notes, notwithstanding that the claims may be ultimately adjudged the same amount. This is because a successful claimant may only collect his pro rata share of the assets of the failed institution which the RTC as receiver calculates its asset recovery will permit. See 12 U.S.C. § 1441a(b)(4)(A) (providing that RTC has "all the powers provided to the FDIC in sections 11, 12 and 13 of the Federal Deposit Insurance Act") and 12 U.S.C. § 1821(d)(4)(B)(ii)-(iii) (describing methodology of calculation of percentage paid out on claims)
 In contrast, the RTC in its corporate capacity, has a right to anything it can prove is owing on the obligations, unencumbered by any other claims relating to the defunct institution, as long as the claims are covered by § 1823(e), or if they are not, the RTC qualifies as a holder in due course. See Federal Deposit Ins. Corp. v. McCullough, 911 F.2d 593, 603 (11th Cir.1990), cert. denied --- U.S. ----, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). There are at least two exceptions to this rule. The first is to challenge the RTC's holder in due course status and claim that the regulators were aware of the actions on which claimant's defense or claim rest. (This is what Jones seeks to do with his agency argument.) But this exception requires that the claimant show the regulators had actual knowledge of the acts alleged. See Federal Deposit Ins. Corp. v. The Cremona Co., 832 F.2d 959, 964 (6th Cir.1987), cert. dismissed sub nom. Gonda v. Federal Deposit Ins. Corp., 485 U.S. 1017, 108 S.Ct. 1494, 99 L.Ed.2d 883 (1988). But see Langley v. Federal Deposit Insurance Corp., 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987) (actual knowledge is irrelevant with respect to "agreements" falling into 1823(e)). Jones submits no evidence the regulators had actual knowledge of any of the wrongful acts alleged. The second exception is estoppel. See Federal Deposit Ins. Co. v. Harrison, 735 F.2d 408, 412 (11th Cir.1984). Jones submits no evidence that he relied on, or was harmed, by any representations of FSLIC employees themselves. Therefore we affirm the district court's ruling as to Count Six.
 
 
 [17]
 We reject the notion that a tort claim is indistinguishable from a contract claim just because a loan is some how involved. Banks are in the business of lending money and taking deposits. Therefore, it is likely that the sorts of torts that will be asserted against them will arise out of the handling of such loans and deposits. Nevertheless, we acknowledge sometimes a borrower may have claims and defenses arising in both tort and contract and, that sometimes, the distinction is a fine one. That is not the case here. Since we decline to read "agreement," or the rest of the language of 1823(e), so broadly as to include tortious conduct, we simply hold that in such cases only the contract claims would be barred if they do not comport with the requirements of § 1823(e)
 
 
 [18]
 Florida law would probably be the relevant source of the elements necessary to establish an agency relationship in Florida were it not for the fact that, as we will show, federal law precludes finding the bridge bank is an agent of the federal agency
 
 
 [19]
 Although the authority for the actions taken here by the FHLBB and FSLIC derived from 12 U.S.C. § 1729 "Liquidation of insured institutions," a section which does not specifically authorize the establishment of bridge banks, in every material respect those actions mirrored those under permitted under § 1821(e)
 When asked at oral argument whether New Freedom was a "bridge bank," counsel for the RTC responded that "technically" it was not a bridge bank, but "conceptually" it was the same thing. While this answer was precisely correct it fell lamentably short of clarifying the issue for the court.
 
 
 [20]
 Although prior to the enactment of FIRREA, the insolvency of commercial banks and savings and loan institutions was handled by separate regulatory entities and governed by separate statutes, in practice the actions of FSLIC paralleled those of the FDIC. See, e.g., North Mississippi Savings and Loan Assn v. Hudspeth, 756 F.2d 1096 (5th Cir.1985), disapproved on other grounds, Coit Independent Joint Venture v. Federal Sav. & Loan Ins. Corp., as Receiver for FirstSouth, 489 U.S. 561, 574-77, 109 S.Ct. 1361, 1368-71, 103 L.Ed.2d 602 (1989) (FHLBB took actions similar to those in this case; chartering new institution, removing president); First Fed. S & L Assn v. First Fed. S & L Assn, 531 F.Supp. 251, 256 (D.Hawaii 1981) (Regulations promulgated under section 1729(d) give the receiver power to exercise all "rights and powers of such institution"). Accord United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Of course, after FIRREA, § 1821(n) applies to both commercial banks and savings institutions
 
 
 [21]
 The RTC has the same powers pursuant to 12 U.S.C. § 1441a(b)(4)(A) which, among other things, gives the RTC all the powers the FDIC enjoys under § 1821
 
 
 [22]
 One of the statements made at oral argument by the RTC's counsel was that there was "no buyer in sight" for the assets of Old Freedom. This is relevant because it explains why FSLIC took the actions it did with respect to creating and chartering New Freedom. If FSLIC could have found a buyer for the assets of Old Freedom, the ultimate losses, sustained once New Freedom was closed, might have been minimized. As it turned out, it appears that, at best, the FSLIC only postponed the inevitable, and at worst, gave the institution time to incur further losses
 
 
 [23]
 Pursuant to 12 U.S.C. § 1821(n)(9) a bridge bank's status terminates after 2 years, although that may be subject to a limit of three, one year extensions
 
 
 [24]
 Some of the functions which the statute permits the FDIC to perform are to: approve the articles of association, 12 U.S.C. § 1821(n)(2)(C); appoint an interim board of directors, 12 U.S.C. § 1821(n)(2)(D); approve the bylaws, 12 U.S.C. § 1821(n)(2)(E); selectively transfer assets and liabilities from the old institution to the new institution, 12 U.S.C. § 1821(n)(3); remove any member of the board of directors, 12 U.S.C. § 1821(n)(4)(A)(i); set compensation for the board and senior management, 12 U.S.C. § 1821(n)(4)(A)(ii); indemnify interim directors, officers, employees and agents of bridge banks, 12 U.S.C. § 1821(n)(4)(B); waive capital requirements which would otherwise apply, 12 U.S.C. § 1821(n)(4)(C); approve the election of a chairperson for the board, as well as the designation of chief executive officer, 12 U.S.C. § 1821(n)(4)(E)(i) & (ii); require approval of Corporation prior to any sale of assets, merger or consolidation, sale of stock or securities, etc., 12 U.S.C. § 1821(n)(4)(K); advance the bridge bank operating funds, 12 U.S.C. § 1821(n)(5)(B); issue stock for the bridge bank, 12 U.S.C. § 1821(n)(5)(C)
 
 
 [25]
 See 12 U.S.C. § 1441a(e)(1) (describing the powers of the RTC over institutions "organized by" and "within the control of the Corporation."). Pursuant to this section, the RTC may control "growth of assets," "lending and borrowing activities," "asset acquisitions," "use of brokered deposits," "payment of deposit rates," "policy or credit standards," and "capital standards." This is a higher degree of control than normally associated with truly independent organizations
 
 
 [26]
 One allegation does allege negligence directly, on the part of FSLIC, insofar as it entered into the agreement with The First to run New Freedom. Jones claims this agreement put the "fox in the henhouse," Appellant's Reply Brief at 4, because The First was a competitor or potential purchaser of New Freedom's assets should it fail. See supra note 10
 
 
 [1]
 D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)
 
 
 [2]
 In Federal Savings and Loan Insurance Corp. v. Two Rivers Associates, Inc., 880 F.2d 1267 (11th Cir.1989), this circuit held:
 [T]he reasoning behind D'Oench, Duhme requires that it be applied to protect the FDIC and the FSLIC regardless whether the regulatory body is acting in its capacity as a receiver or as a corporate insurer.
 Id. at 1277. Other cases in this circuit are in accord. FDIC v. McCullough, 911 F.2d 593 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); Vernon v. Resolution Trust Corp., 907 F.2d 1101 (11th Cir.1990). In addition, several other circuits have squarely held that the D'Oench doctrine applies to the F.D.I.C. in its receiver capacity. Oklahoma Radio Associates v. FDIC, 987 F.2d 685 (10th Cir.1993); Timberland Design, Inc. v. First Serv. Bank for Savings, 932 F.2d 46 (1st Cir.1991); FDIC v. McClanahan, 795 F.2d 512 (5th Cir.1986); FDIC v. First National Finance Co., 587 F.2d 1009 (9th Cir.1978). Other circuits, without expressly addressing the issue, have applied the D'Oench rule in cases where the F.D.I.C. was acting in the capacity of a receiver. FDIC v. Hadid, 947 F.2d 1153 (4th Cir.1991); FDIC v. Bernstein, 944 F.2d 101 (2nd Cir.1991); FDIC v. Wright, 942 F.2d 1089 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992); Adams v. Madison Realty & Development, Inc., 937 F.2d 845 (3rd Cir.1991); First State Bank v. City and County Bank, 872 F.2d 707 (6th Cir.1989); Firstsouth, F.A. v. Aqua Constr., Inc., 858 F.2d 441 (8th Cir.1988).
 In 1989, 18 U.S.C. § 1823(e) was amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) to explicitly cover situations in which the FDIC acts in its receiver as well as its corporate capacity. FIRREA was enacted on August 9, 1989; several circuits have held this provision to apply retroactively. See FDIC v. Longley I Realty Trust, 988 F.2d 270 (1st Cir.1993); Wright, 942 F.2d at 1097 (7th Cir.1991); FDIC v. Kasal, 913 F.2d 487 (8th Cir.1990), cert. denied, 498 U.S. 1119, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991); Triland Holdings & Co. v. Sunbelt Serv. Corp., 884 F.2d 205 (5th Cir.1989) (applying FIRREA amendments to cases pending at the time FIRREA was enacted). See also Twin Constr., Inc. v. Boca Raton, Inc., 925 F.2d 378, 381-82 (11th Cir.1991) (quoting amended statute, but noting that result the same whether statute or common law D'Oench doctrine applied).
 
 
 [3]
 If D'Oench applied only to bar defenses to a suit on a note, the legal effect would be that RTC could collect on the note, but the obligor on the note could claim in a separate count that the RTC, as successor to the predecessor bank, was liable based on the same facts which were asserted as a defense to the note, which liability could then be set off against the RTC's recovery on the note. There would be the practical difference that the amount of the setoff would probably be less than the full amount of the note (the pro rata share of the assets of the failed institution likely being less than 100%)
 However, the case law does not impose this narrow limitation on the application of the D'Oench doctrine, and I do not understand the majority opinion to be suggesting this. Indeed, this court very recently squarely rejected the contention that D'Oench applies only to bar claims which are related to specific assets, like a note. OPS Shopping Center, Inc. v. FDIC, 992 F.2d 306 (11th Cir.1993) ("every circuit court of appeals which has expressly addressed this argument has rejected it" id. at 309; "we reject appellant's argument that the D'Oench doctrine does not apply merely because the claim at issue relates to a liability of the bank rather than to a specific asset," id. at 311).
 
 
 [4]
 Appellants did not argue on appeal that D'Oench should not apply because the claims are tort claims. In my judgment, this court should not raise the issue sua sponte. See note 7, infra
 
 
 [5]
 In Texas Refrigeration Supply, Inc. v. FDIC, 953 F.2d 975 (5th Cir.1992), the Fifth Circuit held that D'Oench did not preclude a borrower from asserting claims for wrongful acceleration and unreasonable disposal of collateral at foreclosure. The court reasoned that those claims were not barred because they did not arise from a secret or unrecorded agreement, but from the implied good faith obligation made part of every contract under state law. Jones has not argued that the bank had an obligation with respect to the assumption of his mortgage indebtedness which arose by operation of law, and thus would be apparent to the bank examiners when the available documents were considered in light of the relevant law
 
 
 [6]
 See above discussion of Vernon and Astrup
 
 
 [7]
 Although the language of the majority opinion seems to make no distinction amongst the acts and possible torts committed by the bank officials, an argument could be made that one aspect of the bank officials' actions is sufficiently separable from any oral misrepresentations--i.e., the apparent allegation that the officials were motivated by their own self-interest (a conflict of interest) to "kill the deal" which Jones was proposing. I doubt that even a claim limited solely to this activity could escape the D'Oench bar in this case. It is clear that any such scheme to "kill the deal" was intertwined with oral representations or misrepresentations. In other words, the means employed to "kill the deal" was to string Jones along with oral misrepresentations and then refuse to approve the assumption. The motivations of the bank officials may have been separable, but the implementation was intertwined. The Supreme Court decision in Langley stands for the proposition that D'Oench bars a claim based upon an oral representation, even though the misrepresentation is motivated by fraud
 However, I need not decide in this case whether there may have been some discrete acts of the bank officials which are sufficiently separable from any oral representations to escape the D'Oench bar. As noted earlier, appellants have not even argued in this case that D'Oench is inapplicable because the claims are tort claims, much less that the claims fall into a certain category of tort claims that escape the D'Oench bar. I respectfully submit that it would be unfair to appellee in this case for this court either to try to draw the uncharted line defining the outer limits of the D'Oench bar or try to recast and stretch Jones' claims to fit them within any such new definition. Appellants have not asserted this theory or anything remotely resembling it. Appellee thus has had no opportunity to assist the court in defining the appropriate line, and has had no opportunity to proffer evidence to indicate that the instant claims fall on the side of the D'Oench bar. At this stage of the proceedings, appellate review of the grant of summary judgment, I respectfully submit that this court should not raise the issue sua sponte in order to reverse the judgment of the district court.