**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of New Bank of New England, N.A., Plaintiff,**

v.

**Richard M. GREENBERG and A. Frederick Greenberg, Defendants.**

**Civ. A. No. 92–30045–MAP.**

United States District Court, D. Massachusetts.

April 29, 1994.

---

Martine B. Reed, Barbara J. Sweeney, Alice E. Zaft, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, MA, for plaintiff.

Lawrence S. Berkowitz, New York City, Carolyn L. Burt, Mark W. Siegars, Kamberg, Berman, P.C., Springfield, MA, for defendants.

## MEMORANDUM REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

(Docket No. 44).

PONSOR, District Judge.

### I. INTRODUCTION.

Plaintiff, the Federal Deposit Insurance Corporation ("plaintiff" or "FDIC"), as receiver of New Bank of New England, N.A., ("Bank") has filed this action against defendants Richard and Frederick Greenberg ("defendants" or "Greenbergs") to recover monies due on defaulted loans. It has now moved for summary judgment. In ruling on this motion, the court must decide whether, in an action brought by the FDIC in its capacity as receiver of a bridge bank, the *D'Oench Duhme* doctrine precludes a borrower from asserting an affirmative defense based on an oral agreement made with the bridge bank. For the reasons set forth below, the court will hold that the *D'Oench Duhme* doctrine does preclude evidence of this type of agreement. The FDIC's motion for summary judgement will therefore be allowed.

### II. FACTS.

The court will view the facts, as it must when ruling on a motion for summary judgment, in the light most favorable to the nonmoving party, here the defendants.

On June 8, 1990, defendants entered into an agreement with the Bank of New England–West, N.A. ("BNE–West") to finance two automobile dealerships in Lawrence and Northampton, Massachusetts. At the time the Greenbergs entered into this agreement, they both executed a limited guaranty of the loans in the amount of $1,500,000. *See* Amended Complaint ("Complaint") at ¶¶ 4–6.

On June 20, 1990, defendant Richard Greenberg entered into another modification of the agreement and executed an additional limited guaranty of $292,000.

On January 6, 1991, the Comptroller of the Currency, pursuant to the provisions set forth in 12 U.S.C. §§ 191 and 1821(c), declared the BNE–West insolvent and appointed the FDIC as the receiver of the failed institution. *See* Plaintiff's Exhibit A. On the same day, pursuant to 12 U.S.C. § 1821(n)(1)(A), the FDIC appointed the New Bank of New England, N.A. as the so-called "bridge" bank. The nature and purpose of a bridge bank is explained below.

The bridge bank existed from January 6, 1991 until July 11, 1991, when the FDIC dissolved it pursuant to 12 U.S.C. § 1821(n)(12). The FDIC was then appointed Receiver of the bridge bank's assets and liabilities. *See* Plaintiff's Reply Exhibit C.

Prior to the FDIC establishing a bridge bank, the defendants defaulted on their loans. Following the establishment of the bridge bank, the Greenbergs allege they had certain conversations with the bank's officials that provide them with a defense against the FDIC's claims. Nevertheless, the FDIC has filed this action to recover the monies owed based on defendants' personal guaranties. The FDIC has rejected the Greenbergs' defenses, pointing out that the outstanding loans exceed the defendants' guaranties by over $7,000,000. Plaintiff seeks $1,798,000 plus interest, the amount of defendants' personal guaranties. Complaint at ¶ 9.

### III. DISCUSSION.

The motion for summary judgment is straightforward. In essence, the FDIC claims that it is entitled to judgment as a matter of law, because it is undisputed that defendants signed personal guaranties and that these loans are now in default. *See* Plaintiff's Exhibit B, Interrogatories of Richard Greenberg at 5; Plaintiff's Exhibit C, Interrogatories of Frederick Greenberg at 5.

In opposition to the motion for summary judgment, defendants argue that sometime in April 1991, after the BNE was declared insolvent, the FDIC induced them to procure buyers for the automobile dealerships.[1] According to defendants, an agreement was reached with the FDIC that, if they procured buyers, the FDIC would relieve them of their personal guaranties. Defendants also claim the FDIC agreed to discharge a second mortgage on a New York apartment held by Richard Greenberg. *See* Affidavit of Richard Greenberg (R. Greenberg Aff.) at ¶ 2. Relying on these verbal assurances, defendants claim to have expended a substantial amount of money preserving the automobile dealerships to facilitate their sale at the highest possible price. *See* R. Greenberg Aff. at ¶¶ 3–5.

As evidence of this agreement, defendants point to conversations and a letter dated April 11, 1991, from Richard Greenberg to bank representative Richard Driscoll referring to an understanding that defendants' procurement of buyers for the automobile dealerships would relieve them of liability. The Greenbergs claim that after they met their end of the bargain and produced a buyer for the Lawrence dealership and several offers to purchase the Northampton dealership, the FDIC reneged on its original agreement to relieve them of their personal guaranties.

The FDIC counters that evidence of any such oral agreement is precluded by the *D'Oench Duhme* doctrine. The FDIC notes that the defendants' discussions and agreement, if any, were with the bridge bank, *not* with the FDIC itself and as such fall within the reach of *D'Oench Duhme.* The issue here is whether evidence of a secret agreement between the defendants and the bridge bank should be excluded under the *D'Oench Duhme* doctrine and its statutory counterpart, 12 U.S.C. § 1823(e).

Finally, defendants also argue that summary judgment should not be granted because the FDIC cannot establish damages with sufficient certainty.

---

1. As will be seen, the conversations defendants claim to have had with officials of the FDIC were, indisputably, with officials of the bridge bank.

# A. The D'Oench Duhme Doctrine

In *D'Oench Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 457, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942), the Supreme Court recognized a "federal policy to protect [the FDIC] ... against misrepresentations as to the ... assets in the portfolios of the banks which [the FDIC] insures ..."

The *D'Oench Duhme* doctrine operates to bar defenses or claims against the FDIC that are based on unrecorded or "secret agreements" between the bank and the guarantors. The doctrine applies whether the FDIC is acting in its corporate capacity or as receiver, *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 49 (1st Cir.1991), and bars affirmative defenses and claims whether they sound in tort or contract law. *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1344 (1st Cir.1992).

Congress enacted the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.* codifying the *D'Oench Duhme* doctrine in § 1823(e), which provides in part:

No agreement which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase as a receiver of any insured depository institution shall be valid against the [FDIC] unless such agreement

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee ..., and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e).

Section 1823(e), however, does not afford carte blanche protection for the FDIC. For example, in *Federal Deposit Ins. Corp. v. Blue Rock Shopping Center, Inc.*, 766 F.2d 744 (3d Cir.1985), the court stated that "we have found nothing to demonstrate that the section was designed to protect the FDIC against the consequences of its own conduct with respect to the asset after acquiring it ..." *Id.* at 753.

From a practical standpoint, the *D'Oench Duhme* doctrine and § 1823 enables the FDIC quickly and accurately to ascertain the failed bank's value. *Bateman v. F.D.I.C.*, 970 F.2d 924, 928 (1st Cir.1992). The *Bateman* court explained

[s]ince the FDIC must try quickly to sell the "received" bank's assets and accompanying liabilities to a solvent bank (called a "bridge bank") while the FDIC itself retains (in its corporate capacity) unsalable assets and liabilities, it is important that FDIC officials, examining the insolvent bank's documents, feel they can rely, for valuation purposes, upon the bank's documents as meaning what they say. (citations omitted) An FDIC official, looking through an insolvent bank's books the day of its collapse, and coming across a paper that says, for example, "John Doe promises to pay the Bank $5 million" must know (and know quickly) whether the Bank is $5 million richer, or whether some side-agreement with Doe means that Doe has to pay the bank only $1 million, not $5 million. That is why the statute says that any such side-agreement must be (1) in writing *and* (2) executed by the bank *and* (3) approved by the bank's board of directors, *and* (4) have been kept continuously in the bank's records. 12 U.S.C. § 1823(e).

*Id.* at 928.

Congress has afforded bridge banks the same protection as the FDIC under the *D'Oench Duhme* doctrine. In other words, an oral or "secret" agreement between a borrower and a failed bank institution is unenforceable as a defense to an action by the bridge bank brought against the borrower unless it meets the same non-secrecy requirements mandated in § 1823. *See Texas Refrigeration Supply, Inc. v. Federal Deposit Ins. Corp.*, 953 F.2d 975, 980 (5th Cir. 1992).

B. *Role of FDIC and Bridge Banks when a Federally Insured Depository Institution is Rendered Insolvent.*

In an attempt to avoid the impact of the *D'Oench Duhme* doctrine, defendants offer two arguments. First, defendants state that the *D'Oench Duhme* doctrine does not apply in this situation because the oral agreement was made *after* BNE–West was rendered insolvent and the FDIC appointed receiver. Second, defendants suggest that *D'Oench Duhme* is inapposite in this situation because the FDIC was acting as the "alter ego" of the bridge bank. Therefore, defendants argue, *D'Oench Duhme* should not be extended to protect the FDIC for what was, in essence, the FDIC's own conduct.

In order to analyze defendants' legal theories properly, it is important to understand clearly the respective roles of the FDIC and the bridge bank during insolvency proceedings.

When a bank is rendered insolvent, the FDIC takes on a dual role, acting as receiver of the failed institution and, in its corporate capacity, as insurer of the deposited funds. As receiver, the FDIC is responsible for managing the assets and liabilities on behalf of the bank's creditors and shareholders. Generally speaking, the FDIC is faced with two options: liquidation or purchase and assumption. In *Timberland Design, Inc. v. First Serv. Bank for Savings,* 932 F.2d 46, 48 (1st Cir.1991), the court of appeals provided an excellent description of the FDIC's role in bank failures. The FDIC's options were described as follows:

> The liquidation option is the easiest method, but carries with it two major disadvantages. First, the closing of the bank weakens confidence in the banking system. Second, there is often substantial delay in returning funds to depositors.
> The preferred option when a bank fails, therefore, is the purchase and assumption option. Under this arrangement, the FDIC, in its capacity as receiver, sells the bank's healthy assets to the purchasing bank in exchange for the purchasing bank's promise to pay the failed bank's depositors. In addition, as receiver, the FDIC sells the "bad" assets to itself acting

in its corporate capacity. With the money it receives, the FDIC-receiver then pays the purchasing bank enough money to make up the difference between what it must pay out to the failed bank's depositors, and what the purchasing bank was willing to pay for the good assets that it purchased. The FDIC acting in its corporate capacity then tries to collect on the bad assets to minimize the loss to the insurance fund. Generally, the purchase and assumption must be executed in great haste, often overnight.

*Id.* at 48 (internal citations omitted).

In the preferred purchase and assumption scenario one important goal of the FDIC is to purchase the failed institution and reopen it without interrupting regular banking operations. This is where the bridge bank fits in. A bridge bank is an institution organized by the FDIC to acquire the assets and assume the liabilities of a failed bank. *See Texas Refrigeration Supply, Inc. v. Federal Deposit Ins. Corp.,* 953 F.2d 975, 979 n. 5 (5th Cir.1992). A bridge bank is frequently needed because it is often impossible for the FDIC to arrange immediately for a receiver of the failed institution. *See* Note, *An FDIC Priority of Claims Over Depository Institution Shareholders,* 41 Duke L.J. 329, 336 (1991). In this situation, the FDIC sets up a bridge bank to take over the failed bank temporarily while the FDIC prepares a purchase and assumption. Despite its short life, a bridge bank is a full-service national bank established on an interim basis to assume the deposits, certain liabilities, and substantially all of the assets of the failed bank. *Id.*

The FDIC is authorized to create bridge banks out of financial institutions that it deems to be in default or that it anticipates will be in default. *Jones v. Resolution Trust Corp.,* 7 F.3d 1006, 1016 (11th Cir.1993).

Bridge banks are creatures of statute. A bridge bank serves as a vehicle to smooth the transition of a failed institution so that the FDIC need not immediately put an institution into receivership and pay out on insured deposits if there is a possibility

that a buyer for the assets may emerge. It is a temporary institution.

*Id.*

The bridge bank assumes the liabilities and assets of the failed institution and is terminated on the merger or consolidation of the bridge bank with another bank, the sale of the stock of the bridge bank to another bank, the passage of two years from the date of creation (with an option to renew for three successive one-year periods), or the assumption of all of the deposits and liabilities by another bank. *Id.* at n. 5 (citing 12 U.S.C. § 1821(n)).

**1. *Application of D'Oench Duhme Doctrine***

Defendants offer two arguments in support of their position that the *D'Oench Duhme* doctrine does not apply in this situation. First, defendants contend that *D'Oench Duhme* applies at the moment the bank is rendered insolvent, rendering all prior oral agreements of the insolvent bank unenforceable against the bridge bank or the FDIC. It does not apply on the facts of *this* case because the agreement was made *after* the bank was declared insolvent and the FDIC was appointed receiver. This argument can be addressed rather quickly by analyzing the plain language of 12 U.S.C. § 1823(e).

■ The plain language of 12 U.S.C. § 1823(e) supports the conclusion that the *D'Oench Duhme* doctrine applies not only when the Comptroller of the Currency renders the financial institution insolvent but also when the FDIC acts as receiver of the assets and liabilities of the bridge bank. Section 1823(e) provides that no agreement tending to "diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC]" unless the non-secrecy requirements set forth are met. The statute itself does not differentiate between oral agreements made before the bank is rendered insolvent and those made after the FDIC is appointed.

In this case, on January 6, 1991, the Office of the Comptroller of Currency rendered the BNE insolvent and appointed the FDIC as the receiver of BNE pursuant to 12 U.S.C. § 1821(c)(2)(ii). In turn, the FDIC immediately chartered the bridge bank, New Bank of New England, N.A., pursuant to 12 U.S.C. § 1821(n) and assigned substantially all of BNE's assets to the bridge bank. The bridge bank was in existence from January 6, 1991 until July 11, 1991, when the FDIC dismantled it pursuant to 12 U.S.C. § 1821(n)(12)(B). This section provides that upon certification by the Board of Directors of the FDIC of its intent to dissolve the bridge bank, the Comptroller of the Currency shall appoint the FDIC receiver for the bridge bank. Acting as receiver for the bridge bank, the FDIC receives all of the rights, powers, and privileges once held by the bridge bank.

Here, pursuant to the provisions of 12 U.S.C. § 1821, the FDIC dissolved the bridge bank and received all of the assets and liabilities held by the bridge bank, including the personal guaranties signed by the defendants. Section 1823(e) clearly states that when the FDIC is acting in this capacity (as receiver of assets acquired under § 1821) *any* oral agreements must be in writing to be enforceable against the FDIC.

■ Application of the *D'Oench Duhme* doctrine in this instance is supported by the central purpose underlying the doctrine. The aim of the law is to protect depositors and creditors of a failed bank, who *cannot* protect themselves, over a borrower who *can*. *Timberland Design, Inc. v. First Serv. Bank for Savs.*, 932 F.2d 46, 48 (1st Cir.1991). Borrowers, such as defendants here, who enter into special arrangements with banking officials, have the ability to memorialize the terms of their agreements in writing. As the First Circuit noted in *Federal Deposit Ins. Corp. v. Caporale*, 931 F.2d 1 (1st Cir.1991),

> as among borrowers, thrift regulators, depositors, and creditors, the borrower is in the best position to protect himself and must therefore suffer the risk of loss if he fails to ensure that his agreement is properly recorded.

*Id.* at 2. It is undisputed the Greenbergs failed to have the agreement they offer as a defense here reduced to writing.

In his affidavit Richard Greenberg argues that it was *FDIC* representatives, not the bridge bank officials, who agreed to modify the conditions of the loan. If evidence existed in the record to support this contention, summary judgment of course would be inappropriate. However, the undisputed facts of record do not support this allegation.

In their initial response to the .FDIC's motion for summary judgment, defendants argued that it was the *FDIC* who agreed to forgive defendants' personal guaranties if the defendants secured buyers for the dealerships. In their submissions, defendants pointed to a letter dated April 11, 1991, to bank representative Richard Driscoll, which referred to a conversation relating to the procurement of buyers for the two automobile dealerships. In his affidavit and deposition testimony, Richard Greenberg stated that these conversations were with the FDIC and that Driscoll and several others were acting on behalf of the FDIC when making these promises. *See* Aff. of R. Greenberg at ¶ 2.

The undisputed facts show that the bridge bank, not the FDIC, was responsible for the day-to-day operations of the failed institution. It is undisputed that the conversation and alleged oral agreement occurred sometime in April of 1991. At this time the defendants were dealing with the *bridge bank*, not FDIC. The record contains no evidence which would support the conclusion that the defendants met with FDIC representatives and not agents of the bridge bank. In fact, the letter submitted by the defendants cuts against the argument that it was the FDIC who agreed to modify the loan. The FDIC was not a party to the side agreement allegedly made with the bridge bank.

The defendants seem to recognize this reality in as much as their reply brief focuses on the bridge bank as the "alter ego" of the FDIC. Their argument can be expressed as follows. The bridge bank is organized by the FDIC for the purpose of arranging a purchase and assumption transaction. Under the provisions of the statute, the bridge bank receives operating funds from the FDIC, and the FDIC can decide to dissolve it if certain conditions are met. Therefore, ·defendants

argue, the bridge bank is merely an instrumentality of the FDIC and is acting on behalf of the FDIC. Under existing case law, the FDIC cannot assert the *D'Oench Duhme* doctrine to preclude evidence that the FDIC itself entered into an oral agreement with the borrower to modify the terms of a loan. *See Federal Deposit Ins. Corp. v. Blue Rock Shopping Center,* 766 F.2d 744 (3rd Cir. 1985). Because the FDIC had such pervasive control over the bridge bank, the bridge bank and the FDIC should be treated as the same entity. The FDIC should not be able to hide behind *D'Oench Duhme* to deny the existence of an oral agreement made by the bridge bank.

It is noteworthy that neither the parties nor the court could find any district court or court of appeals decision directly addressing a defense arising from an oral agreement with a bridge bank. While defendants' position is not without some merit, a careful review of the statutory language and case law supports the conclusion that, despite the FDIC's considerable control, the bridge bank is not the "alter ego" of the FDIC.

First, the plain language of the statute provides that "[a] bridge bank is not an agency, establishment, or instrumentality of the United States." 12 U.S.C. § 1821(n)(6)(A). Even though the FDIC exerts control over the bridge bank, the statute explicitly makes the bridge bank a separate entity.

Second, the Eleventh Circuit recently addressed a somewhat similar issue in *Jones v. Resolution Trust Corp.,* 7 F.3d 1006 (11th Cir.1993). Although *Jones* did not involve a claim that an oral agreement by a bridge bank modified the borrower's existing loan, it did involve claims against the FDIC based on the conduct of the bridge bank. In *Jones,* plaintiff argued that the federal authorities exerted such pervasive control over the bridge bank that they should be held liable for the bridge bank's negligence. The court of appeals disagreed, stating that this conclusion was inconsistent with the statutory exclusion of liability under 12 U.S.C. § 1821(n)(6)(A). The court reasoned that, despite having virtually complete control of the bridge bank and complete control and

approval powers over all major decisions, "12 U.S.C. § 1821(n)(6)(A) states unequivocally: 'A bridge bank is *not* an agency, establishment, or instrumentality of the United States.' In other words, the bridge bank is not an extension of the FDIC...." *Jones v. Resolution Trust Corp.*, 7 F.3d 1006, 1016–17 (11th Cir.1993) (footnote and citations omitted). The bridge bank steps into the shoes of the *failed bank,* not the FDIC.

■ To conclude, because the statute clearly provides that the bridge bank is not the "alter ego" of the FDIC and because the statute provides for the assertion of the *D'Oench Duhme* doctrine in situations where the FDIC acts as receiver of assets under § 1821, evidence of the oral agreement between defendants and the bridge bank offered to modify the terms of the loan is barred.

In rendering this decision, the court recognizes that some unfairness may result. As defendants point out, if a borrower is precluded from raising an affirmative defense against the FDIC based on the conduct of the bridge bank, many borrowers will be remediless because the bridge bank is by definition a temporary institution. It will usually not be present to respond to claims. The FDIC will not be liable for actions taken by the bridge bank even though it controls virtually every aspect of the bridge bank's operation including its creation and ultimate dissolution.

While this may be true, the potential for unfairness in this situation is no different, in kind, from the problems for defendants created by the doctrine generally. The plain language of the statute, the relevant case law, and the underlying rationale of the *D'Oench Duhme* doctrine require its application here.

In addition, the economic realities of the banking industry suggest that *D'Oench Duhme* protection should be extended to the FDIC in this situation. The purpose of the bridge bank is to take over the failed bank temporarily while the FDIC prepares it for purchase and assumption rather than liquidation. Private institutions as well as newly created financial institutions can serve as bridge banks. The use of bridge banks by the FDIC to smooth out the transition and arrange a purchase and assumption would be greatly hampered if the court were to allow a borrower to introduce evidence of an oral agreement with a bridge bank in an action later brought by the FDIC. It would be risky for the FDIC to create a bridge bank or to arrange for a private institution to take over the insolvent bank during the interim period. Because most purchase and assumption arrangements cannot be made overnight, the FDIC would be forced to liquidate the assets of a failed banking institution. As a result, many banks would simply be forced to shut their doors, ultimately weakening confidence in the banking system. This is not what Congress envisioned in creating 12 U.S.C. § 1823.

### 2. *Knowledge of FDIC*

Next, defendants argue that the *D'Oench Duhme* doctrine should not be applied in this case because the FDIC had actual knowledge of the bridge bank's oral agreement not to collect on the loan.

■ In *Timberland Design v. First Serv. Bank for Sav.*, 932 F.2d 46 (1st Cir.1991), plaintiff claimed that *D'Oench Duhme* should not apply because the FDIC had knowledge of the alleged oral agreement by the bank to loan the plaintiff 3.9 million dollars. *Id.* at 50. The First Circuit rejected this argument, stating that the proper focus under *D'Oench Duhme* was not whether the FDIC had knowledge of the secret agreement but "whether the agreement, at the time it was entered into, would tend to mislead the public authority ... Thus several courts have noted that the FDIC's actual knowledge of the agreement at the time it acquires the note is irrelevant." *Id.* at 50 (citations omitted). For the reasons stated by the First Circuit in *Timberland,* the court rejects defendants' argument that *D'Oench Duhme* should not be applied because the FDIC had knowledge of the alleged oral agreement defendants and the bridge bank. *Accord Langley v. Federal. Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

## C. Abuse of Process

Finally, defendants present a brief argument that, even if *D'Oench Duhme* precludes evidence of the side agreement, their defense that the FDIC's conduct constituted an "abuse of process" survives. In *New Bank of New England, N.A.: v. Callahan,* 798 F.Supp. 73 (D.N.H.1992), the court held that abuse of process, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing claims were not barred by *D'Oench Duhme* because these defenses were not based on any agreement. *Id.* at 77.

Defendants base their abuse of process claim on a letter from an attorney for the bridge bank to his own client, bridge bank Vice–President Kurt Matthews. *See* Defendants' Exhibit E. In the letter, the attorney discussed litigation strategies as to the defendants. The attorney suggested that the bank consider filing suit against the defendants in Springfield and stated that

> [b]y extending the "supply lines" resulting from suit in Springfield, we might very well cause substantial inconvenience to the Greenbergs and impede the defenses, as well as any counterclaims against the Bank and others which are sure to follow.

■ In order to assert a claim of abuse of process under Massachusetts law, defendants must show that

> the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.

*Beecy v. Pucciarelli,* 387 Mass. 589, 595–96, 441 N.E.2d 1035 (1982) (citations omitted). Defendants' claim that the statement found in the bank attorney's letter that filing suit against defendants will cause them "substantial inconvenience" and would impede their defenses is sufficient to state a claim of abuse of process. The court disagrees.

■ The filing of the present action by the FDIC to enforce the terms of the personal guaranties signed by defendants cannot be characterized as groundless. An abuse of process claim is not the appropriate remedy where the FDIC has filed a legitimate suit to recover on defendants' personal guaranties.

The fact that the bank's attorney stated that filing of this action in Springfield would cause defendants substantial inconvenience does not affect the validity of FDIC's suit to recover the defaulted loans.

A review of the record shows that defendants reside in New York. Therefore, as the bank attorney noted, a lawsuit filed by the FDIC in Springfield rather than New York could very well cause inconvenience to defendants. The appropriate remedy, if any, is for the defendants to move for a change of venue. *See* 28 U.S.C. § 1406.

In short, summary judgment must be granted on defendants' abuse of process claim.

## D. Damages

In a final attempt to avoid the entry of summary judgment, defendants contend that the FDIC has failed to offer sufficient evidence of damages to entitle it to judgment. A review of the submissions, however, conclusively demonstrates otherwise.

■ In its motion for summary judgment, the FDIC has attached the affidavit of Brian Smith, Vice–President of RECOLL Management Corporation. *See* Plaintiff's Exhibit A, Affidavit of Brian Smith ("Smith Aff."). In his affidavit, Smith states that he personally reviewed the loan documents between defendants and the Bank. It is not disputed that the total amount due on the defaulted loans, including principal and interest, is approximately $9,841,381. It is immaterial that the exact amount owed on the outstanding loan is uncertain because the FDIC is seeking to recover an amount totalling $1,798,000.00 in principal plus interest, which is both indisputably owed and indisputably less than the amount outstanding on the defaulted loans.

## IV. CONCLUSION.

For the reasons stated above, the court hereby ALLOWS the plaintiff's motion for summary judgment. The clerk is ordered to

enter judgment in favor of the plaintiff in the amount of $1,798,000.00, plus interest.