**OPS SHOPPING CENTER, INC.,
Plaintiff–Appellant,**

v.

**FEDERAL DEPOSIT INS. CORP.,
Defendant–Appellee.**

No. 92–2297.

United States Court of Appeals,
Eleventh Circuit.

May 28, 1993.

David L. Fleming, Gulf Breeze, FL, for plaintiff-appellant.

J. Scott Watson, FDIC, Washington, DC, for defendant-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and HILL, Senior Circuit Judge.

ANDERSON, Circuit Judge:

OPS Shopping Center (OPS) appeals from the district court's entry of summary judgment in favor of the Federal Deposit Insurance Corporation (FDIC). OPS sued the FDIC as receiver of the American Bank, in an effort to collect on a $100,000 letter of credit that the bank had issued to Fred and Vasila Konstand.[1] The district court granted the FDIC's motion for summary judgment, holding that OPS's claim was barred by both the common law *D'Oench* doctrine and 12 U.S.C. § 1823(e), which codified the doctrine. For the reasons that follow, we affirm the district court's order.

## I. FACTS AND PROCEEDINGS BELOW

On May 22, 1985, the Blanding Partnership (Blanding), through Gary Spaniak and two other general partners, executed and delivered a promissory note to David and Linda Fleming and to Fred and Vasila Konstand. That same day, Joseph Amato, acting on behalf of Blanding, applied for a $100,000 letter of credit from the American Bank in Wisconsin. Alan Kirchner, the bank's president, issued an irrevocable $100,000 letter of credit designating the Konstands as its "beneficiary" and Amato as the "applicant." It provided that in order to draw on the letter of credit, the beneficiary must submit an affidavit from the Konstands' attorney stating that there had been a default "under the terms and conditions of that certain mortgage note and mortgage agreement from Joseph Amato" to the Flemings and the Konstands. The letter of credit did not reveal that it was for the benefit of Spaniak or Blanding, or that they were the actual borrowers.

At the time the letter of credit was issued, the bank was subject to a cease and desist order issued by the FDIC, which prohibited the bank from extending credit to Spaniak or to others for Spaniak's benefit. The order further prohibited the bank from making a loan to a borrower located outside a fifty mile radius of the bank's offices, unless the bank's board of directors gave unanimous advance approval. The bank's internal loan policy limited Kirchner's power to extend credit without the approval of the board of directors or the loan committee; Kirchner's limit was $5,000 for unsecured loans or $10,000 for secured loans. If Kirchner wanted to extend credit in excess of his limit, he was required to obtain the approval of the board of directors or the loan committee. At the time the letter of credit was issued, there was no loan committee operating. Moreover, the minutes of the meetings of the board of directors do not reflect that the board considered or approved the issuance of the letter of

---

1. The Konstands purported to assign the letter of credit to the First State Bank of Pensacola, now known as the First Union National Bank of Florida. After initiating an action in state court to collect on the letter of credit, First Union assigned its interest in the claim it had filed with the FDIC to OPS.

credit. There was no record whatsoever of the letter of credit in the bank records.

On May 1, 1986, Spaniak and Blanding defaulted on the underlying note. On or before May 22, 1986, demand was made for payment on the letter of credit; an affidavit was submitted which stated that a default existed under that "certain mortgage and mortgage agreement made from Joseph Amato to David L. Fleming and Linda M. Fleming and Fred Konstand and Vasila Konstand dated May 22, 1985 by failure to make payments in full on May 1, 1986 as per the terms of that note and mortgage."[2]

The bank refused to pay on the letter of credit. A complaint was filed against the American Bank in state court on June 11, 1986, for non-payment of the letter of credit. On June 20, 1986, the Wisconsin State Banking Commission declared the bank insolvent and took possession and control of it. The FDIC accepted the Commission's tender of the appointment of receivership, pursuant to Wis.Stat. § 220.081. A claim was filed with the FDIC. After the FDIC denied the claim, a complaint was filed in state court against the FDIC; the FDIC removed the lawsuit to federal court. Following discovery, both OPS and the FDIC moved for summary judgment. The district court granted the FDIC's motion, holding that the letter of credit claim was barred by both 12 U.S.C. § 1823(e) and the common law *D'Oench* doctrine. OPS brought this appeal.

## II. DISCUSSION

In *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the FDIC acquired a note as part of the collateral securing a loan to an insured bank. The FDIC sued the maker, who alleged that there was an undisclosed agreement between it and the failed bank that the note would not be called for payment. The Court concluded that such a "secret agreement" could not be a defense to a suit by the FDIC, stating:

> The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect.

It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled. *Id.* at 460, 62 S.Ct. at 681. In *Baumann v. Savers Federal Savings and Loan Assoc.*, 934 F.2d 1506 (11th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992), this court noted that the *D'Oench* doctrine has expanded beyond the factual background of the *D'Oench* case itself, so that it "now applies in virtually all cases where a federal depository institution regulatory agency is confronted with an agreement not documented in the institution's records." *Id.* at 1510. This court enunciated the *D'Oench* rule as follows:

> In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.

934 F.2d at 1515. In *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court articulated the purpose of the *D'Oench* doctrine:

> One purpose ... is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, ... and when the FDIC is deciding whether to liquidate a failed bank ..., or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank....
>
> A second purpose ... is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of

---

**2.** Amato was not the maker of the note or the mortgagor on the mortgage. The affidavit made no reference to Spaniak, who had signed the note, or to Blanding.

the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Id.* at 91–92, 108 S.Ct. at 401. In the *D'Oench* case itself, the Supreme Court set out the test quoted above: a maker who lends himself to a scheme or arrangement whereby the banking authority is likely to be misled cannot make a claim against the FDIC on the basis of such a secret scheme or arrangement.[3]

Application of the *D'Oench* doctrine to bar appellant's claim based upon the letter of credit would clearly serve the purposes of the doctrine. In this case, it is undisputed that the letter of credit was not reflected in the bank's files, records, or board minutes. In inspecting the records of the bank, bank examiners would have found no record of the letter of credit; thus application of the *D'Oench* bar would serve the first purpose of the doctrine. The second purpose of the doctrine—to ensure mature consideration of unusual loan transactions by senior bank officials—also focuses precisely on the instant

situation. Here, the lack of consideration by the loan committee or the board of directors resulted in the extension of credit to parties which an existing cease and desist order would have prohibited. Finally, the relevant parties here clearly lent themselves to a scheme or arrangement whereby the banking authority was likely to be misled. The Konstands, beneficiaries of the letter of credit, did not insist upon approval by a loan committee or board of directors. They also disregarded the fact that the text of the letter of credit incorrectly described Joseph Amato as payor of the note and mortgage, rather than the true payor.

Appellant's primary argument on appeal is that the *D'Oench* doctrine does not apply to bar the instant claim because the "secret agreement" upon which appellant relies relates to a liability of the bank rather than to a specific asset of the bank which has been acquired by the FDIC.[4] We can discern nothing in the purpose of the *D'Oench* doctrine which would support appellant's proposed limitation of the doctrine. Moreover, every circuit court of appeals which has expressly addressed this argument has rejected it. *Jackson v. Federal Deposit Ins. Corp.*, 981 F.2d 730 (5th Cir.1992) (rejecting the argument); *North Arkansas Medical Center v. Barrett*, 962 F.2d 780, 788–89 (8th Cir.

---

3. The *D'Oench* doctrine has been codified at 12 U.S.C. § 1823(e), which provides in pertinent part:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) was, continuously, from the time of its execution, an official record of the depository institution.

Section 1823(e) was amended by § 217(4) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–

73, which added the language "or as receiver of any insured depository institution." Following the amendment, § 1823(e) applied to the FDIC in its receiver capacity as well as its corporate capacity. FIRREA also expanded the situations in which the protections under § 1823(e) would be available. Section 1821(d)(9)(A) now provides:

Except as provided in subparagraph (B), any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation.

Because we decide this case on the basis of the common law *D'Oench* doctrine, we need not address the FDIC's statutory arguments. In particular, we need not address the FDIC's argument that § 1821(d)(9)(A) extends the protections afforded under the statute to claims against the FDIC that are not related to a specific asset held by the FDIC.

4. The FDIC does not contend in this case that there was an asset held by the FDIC to which the letter of credit was related.

1992) (holding that policy behind *D'Oench* applies to obligations owed by bank as well as loans owed to bank); *Timberland Design, Inc. v. First Service Bank for Savings*, 932 F.2d 46, 49–50 (1st Cir.1991) (*"D'Oench* protects the FDIC from Timberland's affirmative claims which are based upon an alleged oral agreement to lend money in the future"); *Hall v. Federal Deposit Ins. Corp.*, 920 F.2d 334, 339 (6th Cir.1990) (*D'Oench* doctrine held to protect the FDIC even where the FDIC does not have "an interest in an asset"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991); *Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013, 1016 (5th Cir.1990) (applying *D'Oench* and holding that the "agreement need not implicate a specific obligation, such as a note or other asset held by the FDIC"); *Bell & Murphy & Assoc., Inc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750, 753 (5th Cir.) (rejecting argument that the *D'Oench* doctrine "bars only claims or defenses based upon unrecorded side agreements that defeat the FDIC's interest in a *specific asset* acquired from a bank"), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). *See also First State Bank v. City and County Bank,* 872 F.2d 707 (6th Cir.1989).

However, the following language in *Vernon v. Federal Deposit Ins. Corp.,* 981 F.2d 1230 (11th Cir.1993), does provide support for appellant's argument:

> The rationale of *Vernon I* [907 F.2d 1101] is easily extended to this case and we reiterate the court's finding there: "In every *D'Oench* doctrine case, save one, the FDIC, the FSLIC or some successor in interest asserted or defended the validity and enforceability of a particular debt or monetary obligation owed to the failed bank...." *Id.* at 1107. Appellants' tort claims are the same as those in *Vernon I,* only now the defendant/appellee is the FDIC. As previously mentioned, there are no facts on the record connecting the loans made to Mr. Vernon's entities with the securities that Mr. Vernon purchased. Moreover, the FDIC no longer holds any interest in the loans or personal guarantees of Mr. Vernon since these assets have been acquired by New Freedom. We simply do not think the *D'Oench* doctrine op-

erates to bar free standing tort claims that are not related to a specific asset acquired by the FDIC.

*Id.* at 1233–34 (footnotes omitted). We acknowledge that the foregoing language suggests that the *D'Oench* doctrine applies only to bar claims which are related to a specific asset acquired by the FDIC. However, the actual holding of *Vernon II* is merely that a *free standing tort claim,* which is unrelated to a specific asset acquired by the FDIC, is not subject to the *D'Oench* doctrine. In both *Vernon I* and *Vernon II,* the free standing tort claim involved alleged violations of securities laws and related claims arising from the claimants' purchase of preferred stock and warrants to purchase common stock in the failed institution itself.

It would constitute a significant extension of the *Vernon* holding to exempt the present case from the application of the *D'Oench* doctrine. In contrast to the claims involved in *Vernon I* and *Vernon II,* the claims involved in this case relate directly to ordinary banking transactions, i.e., the rights and obligations relating to the issuance of a letter of credit by the bank. Banking examiners who inspect and evaluate the bank records reasonably expect the records of regular banking transactions to reflect *all* of the rights and liabilities of the bank regarding such regular banking transactions. By contrast, one would not expect the records of regular banking transactions to record activities unrelated to regular banking transactions. For example, in *Vernon I* and *Vernon II* the relevant records would reside in the department of the bank which handled the sale or transfer of the bank's own stock. If the free standing tort claim had related to the discriminatory treatment of an employee, the relevant records would reside in the personnel department of the bank. In the case of an automobile accident in the scope of an employee's employment, there would be no record at all, at least until the investigatory process took shape. It is one thing to hold, as this court did in *Vernon I* and *Vernon II,* that the *D'Oench* doctrine should not encompass such free standing torts which do not implicate the records of regular banking transactions. *See also Astrup v. Midwest*

*Federal Sav. Bank,* 886 F.2d 1057 (8th Cir. 1989). However, we do not believe that the *Vernon* holding should be extended to exempt from the *D'Oench* doctrine claims which relate directly to regular banking transactions and which should be reflected in the records of regular banking transactions. The central purpose of the *D'Oench* doctrine requires that bank examiners be permitted to rely upon the bank's records of regular banking transactions. To extend the *Vernon* holding to cases involving regular banking transactions, as this case does, would undermine the central purpose of the *D'Oench* doctrine. In addition, failure to apply the *D'Oench* doctrine in this case would undermine the second purpose of the *D'Oench* doctrine—to ensure mature consideration of banking transactions by senior bank officials and to prevent fraud and collusion with employees of troubled banks. Finally, the relevant parties in the instant case clearly lent themselves to the scheme or arrangement which was likely to mislead the bank authority, thus making this case a paradigm for the application of the *D'Oench* doctrine.

We conclude that this case is distinguishable from the *Vernon* holding that the *D'Oench* doctrine does not apply to free standing tort claims which are not related to a specific asset acquired by the FDIC. For the foregoing reasons, we decline to extend the *Vernon* holding to claims arising out of regular banking transactions, a record of which one would expect to be reflected in the records of the bank's regular banking transactions. Thus, we reject appellant's argument that the *D'Oench* doctrine does not apply merely because the claim at issue relates to a liability of the bank rather than to a specific asset.[5]

**5.** OPS also argues that the trier of fact could conclude that the FDIC had actual knowledge of the letter of credit claim before the bank closed and was liquidated. OPS contends that there is an exception to the *D'Oench* rule that exempts parties from the rule when the FDIC has actual knowledge of a claim before it takes over a bank. OPS is incorrect. In *Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987), the Supreme Court held that the FDIC's actual knowledge of an unrecorded agreement is irrelevant to the application of 12 U.S.C. § 1823(e). *See also Twin Constr.,*

## III. CONCLUSION

For the foregoing reasons, we conclude that the *D'Oench* doctrine forecloses OPS from asserting a claim against the FDIC based on an unrecorded letter of credit issued by the American Bank.

AFFIRMED.[6]

*Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 383 (11th Cir.1991) ("[K]nowledge at the time FSLIC *acquires* an obligation is irrelevant.").

**6.** The FDIC also contends that OPS failed to present its demand properly under the letter of credit, and that OPS was thereby barred from collecting under the letter of credit. OPS argues that the FDIC waived any such defense. It is unnecessary for us to decide this issue in light of our holding that the *D'Oench* doctrine bars OPS from asserting its claim against the FDIC.