**BLUEBONNET SAVINGS BANK, et al., Appellants,**

v.

**JONES COUNTRY, INC., Appellee.**

**No. 09–94–127 CV.**

Court of Appeals of Texas, Beaumont.

Nov. 30, 1995.

Rehearing Overruled Dec. 14, 1995.

R. Lynn Fielder, Fisk & Fielder, Keith Cummiskey, Dallas, for appellant.

Nelda Sanchez Adamson, Clayton E. Dark, Jr., Lufkin, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

BURGESS, Justice.

Appellants are Bluebonnet Savings Bank, formerly known as Consolidated Federal Savings Bank, formerly known as Consolidated Federal Bank F.S.B., formerly known as Consolidated Federal Savings & Loan Asso-ciation, Assignee of the Federal Savings & Loan Insurance Corporation (FSLIC), Receiver for Home Savings & Loan Association of Lufkin, Texas, and Thomas Selman.

Jones Country financed a bus through Home Savings which required insurance on the bus. The insurance premium was financed in a separate promissory note. Thomas Selman, the banker who handled the transaction for Home Savings, wire transferred the first premium payment to the insurance broker on May 15, 1986. Home Savings received a certificate of insurance. A new note was executed for the second policy year, and on May 7, 1987, Mr. Selman wire transferred that premium to the insurance broker. Home Savings' records contain neither a certificate of insurance nor a receipt from the insurance carrier.

The bus was involved in an accident on August 16, 1987. The next day Jones Country was told, by their supposed insurance carrier, National Fire and Marine Insurance Company, there was no insurance policy on the bus. Jones Country contacted Home Savings and was assured there was coverage. The note for the insurance was paid by Jones Country to Home Savings on March 8, 1988. On August 7, 1989, based on the accident, a suit was filed against Jones Country in North Carolina. Jones Country had to employ its own counsel to defend the suit, which ultimately settled on May 8, 1991 for $15,000. Jones Country incurred expenses of $33,-776.63 in defense of the litigation. Prior to the North Carolina suit, Home Savings was declared insolvent by the Federal Home Loan Bank Board. The Bank Board appointed the FSLIC as Receiver for Home Savings. The FSLIC transferred and assigned substantially all of Home Savings' assets to Bluebonnet. Bluebonnet received the assets of Home Savings on December 22, 1988. On July 10, 1992, Jones Country sued Bluebonnet, as successor in interest of Home Savings, alleging alternative claims for "negligence, breach of implied and/or express warranties, breach of contract, indemnity and for monies due and owing" Jones Country. The jury found that Thomas, as agent of Home Savings was negligent, that Home Savings "expressly [warranted] to [Jones

Country] that it would obtain" an insurance policy, that Home Savings' failure to procure insurance created a debt to Jones Country, and that Home Savings "should indemnify" Jones Country for losses as a result of Home Savings' failure to fulfill its agreement, if any, to procure an insurance policy. The jury found the same amount of damages, $48,776.63 (total of settlement and litigation expenses), on each ground of recovery. The trial court entered a $48,776.63 judgment against Bluebonnet and Selman.

■ Bluebonnet raises twenty-two points of error. Point of error one, if sustained, would be dispositive of the entire case. It urges that Jones Country's claims were barred by the doctrine of *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e) (1988). Simply put, such doctrine provides that no agreement which tends to diminish the interest of a financial institution under federal receivership shall be valid unless: (1) it is in writing; (2) contemporaneously executed by the depository institution and the person claiming the adverse interest; (3) was approved by the board of directors or loan committee; and (4) from the time of its execution has been continuously a record of the financial institution. Thus, this point involves the interpretation and application of federal law.

Since *D'Oench, Duhme* and the enactment of 1823(e) the Supreme Court has had one occasion to consider this area of the law. In *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court discussed *D'Oench, Duhme* as a precursor of section 1823(e). According to the Court the petitioner was, in essence, seeking affirmative relief to enforce an oral warranty on the property through an action for fraud. The Court declared that section 1823(e) was a matter of strict statutory construction and barred such claims, opening the door for an expansive interpretation of the statute and the *D'Oench, Duhme* doctrine.

■ According to the Supreme Court (which was actually interpreting section

1823(e) in light of *D'Oench, Duhme,* decided prior to the enactment of the statute) the doctrine serves three purposes:

1. "One purpose" is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets without being concerned that an asset of the bank (note) is encumbered by some unrecorded agreement. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities.

2. "A second purpose" is to "ensure mature consideration of unusual loan transactions by senior bank officials."

3. The third is to "prevent fraudulent insertion of new terms, with the collusion of the bank employees, when a bank appears headed for failure."[1]

*Langley,* 484 U.S. at 91–92, 95, 108 S.Ct. at 401, 403, 98 L.Ed.2d at 347, 349; *see also OPS Shopping Center, Inc. v. Federal Deposit Ins. Corp.,* 992 F.2d 306 (11th Cir.1993).

The majority of *D'Oench, Duhme* doctrine cases involve attempts to resist collection on notes the FDIC has acquired from the failed bank. In that situation, equities are applied against the FDIC and its successors, however, following the *D'Oench, Duhme* doctrine, the courts have, in effect, deemed the FDIC a quasi-holder-in-due-course with a complete defense against the claims of common law fraud and violations of state or federal securities laws and with immunity from the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration, and usury.

Over the years, the case law surrounding *D'Oench, Duhme* and the statute (particularly section 1823(e)) has been discussed interchangeably such that it is very difficult to decide where the statute ends and *D'Oench, Duhme* begins. *See Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1095 (N.D.Tex. 1990) describing how section 1823(e) and *D'Oench, Duhme* are interpreted in tandem. Thus, the crucial question is the total protection that the statute and *D'Oench, Duhme* together provide.

---

1. There are no allegations nor evidence of any intent to defraud or commit malfeasance by Jones Country.

The federal common law of *D'Oench, Duhme* equitable estoppel applies when a note has been paid prior to the bank going into receivership and no specific asset is acquired by the federal corporation. *Brookside Assoc. v. Rifkin,* 49 F.3d 490, 495–497 (9th Cir.1995).

*In re NBW Commercial Paper Litigation,* 826 F.Supp. 1448, 1476 (D.D.C.1992) sums up the *D'Oench, Duhme* doctrine thusly:

> *D'Oench* tells bank customers that they should not rely on anything (agreement, representation, or unstated assumption) that is not recorded in the bank's records. They probably will be unable to recover if they assert anything that was said orally or on which they relied, yet failed to have recorded. *D'Oench* places the blame, however, slight, on the customer and relieves the FDIC of responsibility.

The overwhelming majority of the cases that apply the *D'Oench, Duhme* doctrine do not involve the situation where a claimant has proffered *some* documents contained in the institution's files purporting to be a memorialization of the oral agreement.

 Jones Country contends, and the trial judge apparently agreed, that either Home Savings or Tom Selman agreed to procure insurance coverage for Jones Country, and that this agreement is reflected in the note and in a voucher contained in a journal which documented actions taken by Home Savings' employees. The institution's files included: (1) a note which created an obligation in Home Savings to loan $12,936.80; (2) a copy of the resolution of the board of directors of Jones Country for the corporation to borrow $12,936.80 "for the purpose of financing the insurance for one 1986 Newell Coach"; (3) a check from Jones Country to Home Savings in an amount equal to the difference between the amount of the promissory note and the amount of the premium; (4) a journal voucher to document the wire of $16,171.00 to Interstate Marketing Insurance; (5) documentation of an Outgoing Wire Transfer of $16,171.00 from Home Savings to First National Bank Kokomo, to the account of Interstate Marketing Insurance, on May 7, 1987, which established that the loan was funded and that Home Savings wired the entire premium to the broker rather than just the

amount financed; and (6) a May 5, 1987, memo titled "Info on Jones Insurance from Don Adams", which stated in part "Tom, he will send you a copy of the check that he uses to pay the premium and a receipt from the insurance company."

Looking at this transaction on May 7, 1987, which is the standard required by *Langley,* contemporaneously with the loan being made and assuming the scenario that the bank examiner from FDIC appeared that afternoon, the institution's records *do* contain information of an agreement which would be revealed by an examination. *See Brookside Assoc. v. Rifkin,* 49 F.3d 490, 496 (9th Cir. 1995). The agreement is memorialized in documents such that a banking regulator would be aware of it when conducting an examination of the institution's records. *OPS Shopping Center, Inc. v. Federal Deposit Ins. Corp.,* 992 F.2d 306 (11th Cir.1993).

The note reflects Home Savings obligated itself to procure the policy on behalf of Jones Country. On the face of the pre-printed note are the following:

The purpose of this loan is _____
Insurance Premium (typed) _____

| ITEMIZATION OF AMOUNTS FINANCED | | |
|---|---|---|
| Amount given to me directly | $_____ | (a) |
| Amount paid on my account | $_____ | (b) |
| Amounts paid to others on my behalf | | |
| To Property Insurance Company | $12,936.80 (typed) | (c) |
| To Credit Life Insurance Company | $_____ | (d) |
| To Disability Insurance Company | $_____ | (e) |
| To Public Officials | $_____ | (f) |

Clearly, this memorializes the agreement that Home Savings was to procure an insurance policy by transmitting the proceeds of the loan to the insurance company. The itemization, under *"Amounts paid to others on my behalf,"*, shows $12,936.80 was paid *"To Property Insurance Company"* not to property insurance *broker.* The check from Jones Country to Home Savings for the difference between the loan proceeds and the insurance premium is further documentation that Home Savings agreed to procure the insurance. Furthermore, the previous year's transaction verifies that Home Savings was the active party in obtaining the original policy. There were only two parties that could obtain or renew insurance on the bus, the mortgagor or the mortgagee. If Home Savings had not agreed to procure the insurance, then why did they not deliver the loan

proceeds to Ms. Jones and have her transmit the premium to the insurance company? The answer is obvious; Ms. Jones gave Home Savings her check because they had agreed to perform that function.

■ Bank examiners must be cognizant of not only what an institution's files contain, but also what they *do not* contain. The May 5, 1987, memo indicated certain items would be sent to Home Savings. Yet, the files do not contain those items—a copy of the check that was used to pay the premium and a receipt from the insurance company. Nor do the files contain a certificate or policy of insurance as it should have and as would reasonably be expected. A competent bank examiner would recognize that *without an insurance policy* in the file, Home Savings, when the note was paid off, would have $16,171 on their books unaccounted for. That is, the proceeds of the loan and Ms. Jones' check were under the control of Home Savings, but there is nothing to verify a completed disbursement.

In *First Heights Bank, FSB v. Gutierrez,* 852 S.W.2d 596, 607 n. 17 (Tex.App.—Corpus Christi, 1993, writ denied), the trial court submitted a jury question on whether a "reasonably prudent loan examiner who was examining the loan files ... have concluded...." The court of appeals held:

> The *D'Oench* doctrine bars a defense to a suit on a note unless there is *some* evidence in the creditor's file that substantiates the debtor's claim that the note has been paid or that an agreement pertaining to the collection of the note has been made. If this evidence exists in the file, the issue becomes whether that evidence is sufficient to put the successor institution on notice. That question is resolved by inquiring whether a reasonably prudent bank examiner would have concluded from an examination of the file that the defense to the note existed.

*Id.* at 608 (emphasis added).

In *Fair v. NCNB Texas Nat. Bank,* 733 F.Supp. 1099, 1105 (N.D.Texas 1990), the court stated:

> Under *D'Oench, Duhme* agreements 'not clearly evidenced in the bank's records' and not 'apparent to bank examiners' cannot be raised as affirmative claims against

the FDIC ... (citations omitted).... Applying an objective standard, the court concludes, as a matter of law, that the mere presence in a loan file ... would not lead a reasonably prudent bank examiner to conclude that the bank....

See also *In re NBW Commercial Paper Litigation,* 826 F.Supp. 1448, 1466 n. 23 (D.D.C. 1992).

These cases illustrate the requirement of "in writing", by *D'Oench, Duhme,* is, in the proper circumstances, subject to an analysis on the issue of what a "reasonably prudent bank examiner" would have concluded constituted a writing within a bank's file.

Other cases have dealt with the issue of what can be considered when determining if a written agreement complies with *D'Oench, Duhme.*

In *Resolution Trust Corp. v. Oaks Apts. Joint Venture,* 966 F.2d 995 (5th Cir.1992) the trial court was faced with a promissory note, which on its face, obligated five makers for 2 million dollars. A separate, unconditional guaranty, executed at the same time, limited each individual's liability to 20% of the debt. The RTC plead *D'Oench, Duhme* precluded the makers from asserting the guaranty as a defense since the note itself should stand alone and the guaranty constituted the equivalent of an unwritten side agreement. *Id.* at 999. The trial court, *Resolution Trust Corp. v. Oaks Apts. Joint Venture,* 753 F.Supp. 1332, 1336 (N.D.Tex.1990), held:

> The facts of this case do not fit within the parameters of the *D'Oench* rule.... Although the record does not reflect whether the note and guaranty were found in the same file at the time Meridian Savings Association was taken over, that conclusion is inescapable.

Judge Brown, of the Fifth Circuit, said:

> While *D'Oench, Duhme* does require full and complete disclosure of agreements between lenders and borrowers, it does not require that such agreements be confined to the face of any one particular lending/borrowing document. The doctrine precludes enforceability of those side agreements that are either designed to

deceive creditors and bank examiners or actually have that effect. The fact that an agreement between the failed lender and the borrower is manifested in more than one document does not *automatically* imply a deceptive secret agreement.

*Resolution Trust Corp.*, 966 F.2d at 999 (emphasis added).

The appeals court remanded the case back to the trial court because the stipulated facts were not comprehensive enough to determine whether the guaranty was part of the integral loan transaction associated with the note. If it was, *D'Oench, Duhme* would be satisfied and whether or not the guaranty could be used would require an application of Texas law. On the other hand, if the trial court should determine the guaranty was not within the loan transaction files, then *D'Oench, Duhme* would bar the use of the guaranty as a defense. *Id.* at 1000. *See also, Federal Deposit Ins. Corp. v. Laguarta*, 939 F.2d 1231, 1238–39 (5th Cir.1991); *Bank One Texas Nat. Ass'n. v. Morrison*, 26 F.3d 544, 551 (5th Cir.1994).

In *Federal Deposit Ins. Corp. v. White*, 820 F.Supp. 1423 (N.D.Ga.1993), a loan agreement provided for a promise to pay the principal sum of $700,000. Immediately below that provision, the parties checked a provision that stated the principal amount shown above was the maximum amount to be borrowed and $500,000 was received by the borrower with future advances contemplated. The borrower defaulted, a foreclosure occurred and the FDIC sued for the deficiency between the sales price and the $700,000. White filed an answer and a counter-claim. The FDIC moved for summary judgment invoking in part, *D'Oench, Duhme*. White claimed the note was not for $700,000 but only for $500,000 and an additional advance of $30,000. The court, in denying the summary judgment, in part, stated:

> In this case, defendant's defense is not based on an agreement outside the promissory note itself, but is instead an argument that plaintiff, as a matter of law, misconstrues the terms of that note. As such, the *D'Oench* doctrine does not bar a de-

fense based solely upon an interpretation of the contractual language.

*Id.* at 1428.

This case stands for the proposition that if *some* evidence exists in the written documents requiring an interpretation of those documents, as opposed to simply oral agreements, then *D'Oench, Duhme* is not a bar.

A particularly similar and instructive case is *Allied Elevator Inc. v. East Texas State Bank of Buna*, 965 F.2d 34 (5th Cir.1992). Allied Elevator and its owner, Bobby Pierce, borrowed $50,000 from East Texas State Bank of Buna in 1985. Allied and Pierce renewed the note many times, the last time being May 18, 1986. During the term of this extension, Pierce sold his stock to Tom Cobb and Gary Stark. When this note matured, Pierce, Cobb and Allied renewed the note. Pierce initialed a request on the face of this renewal for credit life insurance. The premium was capitalized, raising the amount financed to $50,123.26. Pierce died within the term of this last renewal. When the note matured, Allied refused to pay. Allied, Cobb and Pierce's executrix brought suit in state court alleging the Bank and the life insurance company had breached an agreement to provide credit life insurance. The Bank counterclaimed, seeking judgment on the original note.

In 1988, the Bank failed and the FDIC was appointed receiver. The FDIC removed the case to federal district court and moved for summary judgment on all claims, including the counterclaim. The court granted the motion. It later severed the claims against the insurance company. Allied appealed on two issues. First, that it was error for the district court to rely on the original note and not the last renewal. The appeals court concluded there was an issue of material fact as to which note(s) evidence(s) the indebtedness and remanded for further factual development of the parties' intent.

The Fifth Circuit held a second question of fact concerned the request for life insurance on the face of the renewal note. They stated:

> Appellants contend that the bank *was obligated to procure credit life insurance as*

*requested.* Appellants contend further that if the Bank failed to procure insurance, this breach relieves them of their obligation to pay the note. Thus appellants assert, as a defense to the FDIC's counterclaim, that the Bank breached a material provision in the note.

*Id.* at 38 (emphasis added). The court further held the district court did not consider whether the credit life provision was a material term of the renewal note and remanded the case for further factual development.

The court did not stop there, however, and noted:

The FDIC suggests that a remand is unnecessary because the credit life provision is unenforceable. The FDIC makes two arguments in support of this suggestion, neither of which has merit. First, the FDIC characterizes appellant's claim of credit life insurance as involving an oral agreement and thus barred by [*D'Oench, Duhme* ] (citation omitted). We disagree with the FDIC's characterization. The credit life provision in question is not oral; it is written on the face of the Renewal Note. Thus *D'Oench, Duhme* is inapplicable.

*Id.* at 38.

What is so instructive about this case is the court acknowledges the controversy is about an agreement to "procure credit life insurance". They then conclude the credit life provision is written on the face of the note. Unfortunately, the face of the note is not set out verbatim. Clearly, there was a request for credit life insurance on the face of the note. What is not clear is whether this was an explicit agreement by the Bank to procure the insurance.[2] If there was such an explicit agreement surely the learned panel of Circuit Judges, W. Eugene Davis, Edith H. Jones and Emilio Garza, along with their very competent staffs, would have specifically and forcefully mentioned such an agreement. Therefore, they must have concluded, as a matter of law, that the request for credit life

insurance and the fact of capitalization within the note constituted a written agreement to procure credit life insurance, since they did not characterize this as an issue of material fact nor did they remand for more factual development.

The basis for such a determination is considerably weaker than in the instant case. Compare the capitalization of the premium within the note with the notation: "The purpose of this loan is *Insurance Premium*". The sole purpose of a loan to fund insurance is certainly more persuasive than merely the inclusion of the premium within the note. Compare only an initialed request for credit life insurance with the notation: "Amounts paid to others on my behalf: To Property Insurance Company $12,936.80". The latter more clearly reflects the bank was going to pay a property insurance company for a policy. Compare apparently nothing more with the additional documents within the Home Savings' file—Ms. Jones' check payable to Home Savings (not the insurance company) for the balance, the apparent transfer of the premium and the memo reflecting Home Savings would receive confirmation of the policy being purchased. If the evidence in the East Texas State Bank of Buna case proved, as a matter of law, a written agreement, then the evidence in the instant case overwhelming, did so, or at a very minimum, conclusively raised a fact issue.

Assuming arguendo, the evidence only raised a fact issue, then Bluebonnet was obligated to request a question be presented to the jury. TEX.R.CIV.P. 273, 278. Since Bluebonnet neither submitted such a question nor asked the trial judge to make written findings of such omitted question, then any omitted element is deemed to have been found by the court in such a manner as to support the judgment. Consequently, we must deem that the trial judge resolved that factual determination in favor of Jones Country.

2. Appellants, when discussing this case, state on page 11 of their brief: "It is apparent from reading the opinion that the court's decision turned on the fact that the agreement to procure life insurance was plainly written on the face of the renewal note and, therefore, complied with *D'Oench*." I do not believe the opinion reflects

an agreement *"plainly written"* on the face of the note. While such an agreement is evident from Pierce's initialing a request for credit life insurance and the capitalization of the premium within the note, this is certainly not a "plainly written" agreement that indicated the bank agreed to procure the insurance.

■ In summary, for Bluebonnet to conclude the trial judge erred in refusing to grant either the motion for instructed verdict or the motion for judgment not withstanding the verdict, they must show there was "no evidence" of a written agreement, *see Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983), or the evidence established conclusively there was *no* written agreement, *see Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990). Neither was done. As previously noted in the analysis of *Allied Elevator Inc. v. East Texas State Bank of Buna*, supra, Jones Country proved, as a matter of law, there was a written agreement sufficient to comply with *D'Oench, Duhme* or at the least a fact issue was raised, in accordance with *Gutierrez*, and that fact issue was resolved in Jones Country's favor by the trial judge. Consequently, point of error one is overruled.

■ We next turn to an analysis of the causes of actions submitted to the jury. Any one cause of action, properly submitted and supported by the evidence, is sufficient to support the judgment of the trial court. We first consider the issue of "debt" as submitted.[3]

Points of error nine and ten urge the trial court erred in overruling its motion for instructed verdict and motion for judgment notwithstanding the verdict, and in submitting the jury questions on debt because there was no evidence to support their submission. Specifically, there was no evidence that a debtor or creditor relationship existed between the parties. Their sole argument, from their objections to their brief, is that an "action for debt" must involve a debtor/creditor relationship.

Points of error thirteen and fourteen urge the trial court erred in submitting the jury questions because the definition of debt is an improper definition under Texas law. Here again, the focus is upon the debtor/creditor relationship when Bluebonnet suggests the proper definition of debt is: "a loan or debt is a contract by which one party agrees to let another party have the use of a specific sum of money for a definite period with the stipulation that the borrower repay it with or without interest." *Trevino v. Trevino*, 555 S.W.2d 792, 802 (Tex.Civ.App.—Corpus Christi 1977, no writ). They conclude their argument with the assertion: "it is illogical to conclude that the failure to procure insurance, if any, is tantamount to or in any way consistent with 'a contract by which one party agrees to let another party have the use of a specific sum of money for a definite period with the stipulation that the borrower repay it with or without interest.'"

Since these four points of error are interrelated, they will be discussed together. While there is no specific definition of debt, in the general sense, we turn to Tex.Prac. & Civ.Rem.Code § 16.004(a)(3) (Vernon 1986) which states:

(a) A person must bring suit on the following actions not later than four years after the day the cause of action accrues:

(3) debt.

and the cases that have interpreted "debt" and "actions for debt".

*International Printing Pressmen and Assistants' Union of North America v. Smith*, 145 Tex. 399, 198 S.W.2d 729, 737 (Tex.1946), recognized earlier cases and held "the words 'action for debt', as used in the statute, included suits brought to recover money for the breach of contract without regard for the technical distinction between debts and damages." They noted "such term should not be

---

3.
JURY QUESTION NO. 7
 Did the actions of Home Savings & Loan Association in failing to procure insurance on Plaintiff's motor vehicle create a debt owing by Home Savings & Loan Association to Plaintiffs?
Answer "yes" or "no".
ANSWER: yes
 The term "debt" as used in this charge, does not import merely a duty to pay a sum certain in money; it is used to signify any kind of contractual duty. The term "debt" is not restricted to the more narrow meaning of a debt, but is used

as equivalent to and interchangeable with the term "obligation".
 If you have answered Jury Question No. 7 "yes" then answer Jury Question No. 8. Otherwise, do not answer Jury Question No. 8.
JURY QUESTION NO. 8
 What is the amount of the indebtedness owed by Home Savings & Loan Association to Plaintiffs as found by you in answer to the next preceding jury question?
Answer in dollars and cents, if any.
ANSWER: $48,776.63

given a strict literal interpretation, but on the other hand should be given such a reasonable interpretation as would give it effect according to the spirit, and intention of the statute." *Id.* at 737 (quoting *Texarkana & F.S.R. Co. v. Houston Gas & Fuel Co.*, 121 Tex. 594, 51 S.W.2d 284, 286 (Tex.1932).

*Certain–Teed Products Corporation v. Bell*, 411 S.W.2d 596 (Tex.Civ.App.—Amarillo 1966), *aff'd*, 422 S.W.2d 719 (Tex.1968) grew out of an action by homeowners for damages resulting from defects in construction. The court noted a quote from *Miller v. Kountze Corporate School Dist.*, 54 S.W.2d 344 (Tex. Comm'n App.1932, holding approved): "It is settled that the term 'action for debt' as used in the above article [Art. 5527] includes all suits brought to recover money without regard to any technical distinction between debt and damages." *Certain–Teed*, 411 S.W.2d at 601.

In *City of Houston v. Anchor–Hocking Glass Corp.*, 467 S.W.2d 677 (Tex.Civ.App.— Houston [1st Dist.] 1971, writ ref'd n.r.e.), the City of Houston had agreed it would not charge Anchor–Hocking for sanitary sewer services it was unable to provide. The City inadvertently billed Anchor–Hocking, as a part of the water bill, for sewer service and Anchor–Hocking inadvertently paid the bill. The city discontinued billing once the agreement was called to its attention, but refused to process Anchor–Hocking's request for a refund; Anchor–Hocking sued. The trial court entered judgment for the amount paid within fours years of filing suit. Whether the two [4] or four year [5] statute of limitations applied was the question on appeal. The appellate court held the four year statute relating to "actions for debt" where the indebtedness "is evidenced by or founded upon any writing" applied. *Id.* at 679. In reaching this conclusion they relied upon the language in *International Printing*, 198 S.W.2d at 729. *Id.*

*Brooks Fashion Stores Inc. v. Northpark National Bank*, 689 S.W.2d 937 (Tex.App.— Dallas 1985, no writ) involved a suit where Brooks, on January 16, 1981, left jewelry with the Bank and it could not be located.

The jewelry supplier sued Brooks and later, on May 23, 1983, Brooks sued the bank. Whether the two or four year statute of limitations applied was the question on appeal. The court discussed "actions for debt" and the liberal construction given the term by the courts and held the four year statute applied. *Id.* at 941–942.

*Xarin Real Estate, Inc. v. Gamboa*, 715 S.W.2d 80 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) involved an ultimate purchasers' suit against intermediate purchasers which was principally founded upon an earnest money contract between the original vendors and the intermediate purchasers. Whether the two or four year statute of limitations applied was one of the questions on appeal. The court held the phrase found in former Article 5527, "actions for debt" was to be "liberally construed to embrace actions for money damages for breach of a written contract." *Id.* at 85 (citing *Brooks*, 689 S.W.2d at 937).

In *Mokwa v. City of Houston*, 741 S.W.2d 142 (Tex.App.—Houston [1st Dist.] 1987, writ denied) a police officer sought to recover back pay from the suit pursuant to various civil statutes. The court held Mokwa's suit was an action for debt subject to the four year statute of limitations. *Id.* at 149. They cited *International Printing* for the rule that "debt" was to be broadly construed. *Id.* They also cited *Kierstead v. City of San Antonio*, 643 S.W.2d 118, 120–121 (Tex.1982) (suit involving back wages for EMT's, which approved the Court of Appeals disposition at 636 S.W.2d 522, 527 (Tex.App.—San Antonio 1982) where they held a suit for overtime pay was a suit for "debt"). *See also Kiel v. City of Houston*, 558 S.W.2d 69, 71 (Tex.Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.) (fireman's suit to compel recognition of his promotion and for damages).

All of these cases stand for the general proposition that "an action for debt" may be based upon an "obligation" and need not be based strictly on a "debtor/creditor relationship". Therefore, the cause of action was properly plead and, under the pleading and

---

**4.** Tex.Rev.Civ.Stat.Ann. art. 5526 (repealed 1985) (current version at TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986).

**5.** Tex.Rev.Civ.Stat.Ann. art. 5527 (repealed 1985) (current version at TEX.CIV.PRAC. & REM.CODE ANN. § 16.004 (Vernon 1986).

proof, the definition was proper. These points of error are overruled.

Points of error eleven and twelve urge the trial court erred in submitting the jury questions because they constitute a general charge rather than a specific question as required by law and improperly asked the jury to determine the prevailing party in the litigation rather than to make findings of fact as required by law. Bluebonnet only attacks question 7 in its argument. They first argue the question is global because it does not submit an identifiable act, omission, breach, representation or failure of Bluebonnet. However, the jury question is specific in asking "Did the actions of Home Savings & Loan Association in failing to procure insurance on Plaintiff's motor vehicle create a debt owing by Home Savings & Loan Association to Plaintiffs?" These points of error are overruled.

Point of error twenty-one urges the trial court erred in entering a judgment against Tom Selman individually because the evidence establishes as a matter of law and the only jury findings made established that Selman was a disclosed agent acting for a principal so as to preclude Selman from having any independent tort liability.

■ Point of error twenty-two urges the trial court erred in entering a judgment against Tom Selman individually because Selman was deceased when suit was filed and plaintiffs failed to sue out a scire facias and cause the proper party to defend the suit on behalf of Selman.

Thomas Selman died June 27, 1990, before the suit was filed. He was never served, but an answer was filed on his behalf by the attorney for Bluebonnet Savings Bank. A suggestion of death was filed February 12, 1993. *See* TEX.R.CIV.P. 63. No scire facias issued. *See* TEX.R.CIV.P. 162. Neither the administrator of his estate nor his heirs were brought into the suit. The trial court entered a judgment against Selman. Selman's name appears on the appeal bond, and his signature appears through appellate counsel signing as his "attorney-in-fact." Although the parties have generally acted as though Mr. Selman were still alive, we cannot ignore the fact that Thomas Selman had no legal existence at any time during this suit, and

any judgment against him is void. *Edens v. Grogan Cochran Lumber Co.*, 172 S.W.2d 730 (Tex.Civ.App.—Beaumont 1943, writ ref'd w.o.m.). The points of error as to Thomas Selman are sustained.

The previous points of error being dispositive of the case, we need not consider the remaining points of error.

The judgment of the trial court as to Bluebonnet Savings Bank, formerly known as Consolidated Federal Savings Bank, formerly known as Consolidated Federal Bank F.S.B., formerly known as Consolidated Federal Savings & Loan Association, Assignee of the Federal Savings & Loan Insurance Corporation, Receiver for Home Savings & Loan Association of Lufkin, Texas, is affirmed. The judgment of the trial court as to Thomas Selman is reversed and rendered.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

STOVER, Judge, dissenting.

I am persuaded that the Jones Country claims were barred by the doctrine of *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and 12 U.S.C. § 1823(e) (1988). I would sustain Bluebonnet's first point of error and reverse and render this case. *D'Oench, Duhme* and the federal statute and its progeny provide an objective test to evaluate the worth of banks' assets without being concerned that an asset of the bank (note) is encumbered by some unrecorded agreement. Such assurances promote confidence, order, stability and substance in the examination of the fiscal soundness of a bank and assure accurate assessment of the fiscal condition of the bank based on its books. To depart from an objective test and proceed into the questionable uncertainty and unpredictability of the subjective or factfinding inquiry, in my judgment, would be elusive and ultimately detrimental to the process. I, therefore, respectfully dissent and would urge that the case be reversed and rendered.

Because of the vast amount of writing on this subject I feel it appropriate to limit this dissenting opinion basically to the rulings of the United States Supreme Court and the

United States Court of Appeals, Fifth Circuit.

In *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court discussed *D'Oench, Duhme* as a precursor of § 1823(e). The Court declared that § 1823(e) was a matter of strict statutory construction. The Supreme Court affirmed the Fifth Circuit's opinion in *Langley* [1]. The Fifth Circuit followed *Langley* with *Beighley v. Federal Deposit Ins. Corp.*, 868 F.2d 776, 784 (5th Cir. 1989), applying the objective test.

Again in 1990, the Fifth Circuit in *Bell & Murphy & Assoc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 752–754 (5th Cir.), *cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990) followed the objective test and held that a successor bank (bridge bank) could assert *D'Oench, Duhme* and § 1823(e) defenses:

> The Supreme Court examined the statutory scheme that created the FDIC and concluded that it evidenced a "federal policy to protect ... [the FDIC] and the public funds which it administers, against misrepresentations as to ... the assets in the portfolios of the banks which ... [the FDIC] insures or to which it makes loans." *D'Oench, Duhme*, 315 U.S. at 457, 62 S.Ct. at 679.

The Supreme Court of the United States and the Fifth Circuit cases that have been reviewed are indicative of the fact that *strict statutory construction,* looking to the common law of *D'Oench, Duhme* when construing the statute, applies in determining whether or not there is (1) a written agreement encumbering an asset, (2) executed contemporaneously by the bank and borrower, (3) approved by senior bank officials (4) appearing in the records whereby a bank examiner would be made aware of a "side agreement" that alters the terms of a facially unqualified obligation [2]. It is concluded from our research of the cases from the Supreme Court in *Langley* through the Fifth Circuit Court that the question of whether there is a written agreement wherein the bank is to perform services or obligations outside of a normal loan transaction must be determined as a matter of law. *Fair v. NCNB Texas Nat. Bank,* 733 F.Supp. 1099, 1104–1105 (N.D.Tex.1990) applies the matter of law standard.

As stated in *Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013, 1016 (5th Cir.1990), *D'Oench, Duhme* bars the use of unrecorded agreements. "Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either." *Id.*

Looking at this transaction on May 7, 1987 contemporaneously with the making of the loan (which is the standard required by *Langley* ), there is *no* written agreement executed by the bank and borrower for the bank to act as an agent in procuring the insurance for Jones Country. There is no approval by any senior bank official or loan committee that the bank act in such capacity. There is only a facially unqualified obligation executed in a normal banking transaction wherein the bank is lending money for a borrower to acquire casualty insurance required by the bank for financing of loans on motor vehicles.

The facts involving this case are unusual. For one thing, this is *not* a suit by the FDIC to collect a note. Instead, this is a case wherein the borrower is seeking affirmative action some five and a half years after a banking transaction took place (after such passage of time, miraculously there remained in the bank files records of the transaction). Moreover, the borrower paid off the obligation to Home Savings without assertion of failure of consideration of the note prior to acquisition by the bridge bank (Bluebonnet). In addition, the principal loan officer who handled the transaction is deceased.

There is a significant distinction between an agreement to loan money for the purpose of procuring insurance and an agreement to procure such insurance. Only the former is reflected in the written documentation. It is the quality of papers present not the quantity that controls the transaction. There is no

1. *See Federal Deposit Ins. Corp. v. Langley,* 792 F.2d 541 (5th Cir.1986).

2. One writer in *Real Property,* 47 SMU L.Rev. 1549, 1577 (1994), opines that the Fifth Circuit has not expressly adopted the use of the "reasonably prudent loan examiner" standard.

written agreement executed by the bank under proper authority to procure insurance.

Even if one accepted as true appellee's statement that "Home Savings and/or Selman undertook to obtain insurance for Appellee and as part of the parties' entire bargain," all that would exist is an unqualified note which is, in fact, subject to undisclosed conditions not specifically memorialized. This is in direct violation of statute and prohibited by *D'Oench, Duhme. Langley, supra.* There is nothing in writing that Home Savings obligated itself to procure the policy on behalf of its customer. The transaction as documented in Home Savings' records is simply a loan conducted as a regular banking transaction.

In *Bowen v. Federal Deposit Ins. Corp.,* 915 F.2d at 1016–1017, Justice Goldberg joined by Justices Gee and Williams of the Fifth Circuit addressed the issues raised by *D'Oench, Duhme* and eloquently expressed the opinion of this writer on the subject matter:

> The lack of a malfeasance requirement makes *D'Oench, Duhme* a sharp sword and sturdy shield indeed. What is the purpose of such imposing armaments? Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities. Perhaps mindful of the fate that befell the Baker, whose search for the Snark ended with his own disappearance, *D'Oench, Duhme* seeks to ensure that a bank's assets do not "softly and suddenly vanish away." [*See* L. Carroll, *The Hunting of the Snark,* Fit the Third and Fit the Eighth (i.e., verses 3, 8) (1876).]
>
> The dangers of a contrary policy should be obvious. Today, stable financial institutions sometimes seem as elusive as the Snark. Unrecorded agreements—those rooted in the loose soil of casual transactions as much as those that spring from the malodorous loam of outright fraud—are a threat to the ecology of the banking system that we can ill-afford. To check the growth of these hardy perennials. *D'Oench* forces borrowers to bear the risk that their unorthodox plants will bear no fruit. Those who till these soils may not shift the cost of their peculiar agronomy to the FDIC, the bank's depositors and unsecured creditors, and the taxpayers and depositors who fund the FDIC. *See Bell & Murphy,* 894 F.2d at 753, 754; *F.D.I.C. v. McClanahan,* 795 F.2d 512, 516 (5th Cir. 1986); *First State Bank v. City and County Bank,* 872 F.2d 707, 715 (6th Cir.1989).

As to the Bowens' malfeasance requirement, we would decline to adopt it even in the absence of precedent. Adulterating *D'Oench, Duhme* would amount to abandoning a bedrock protection for the uncertainty of quick-clay, a seemingly stable substance notorious for its rapid liquefaction. The firm resolution we provide today would collapse into an uncertain and factbound inquiry, soon to be followed by a landslide of "good faith" claims against the FDIC. We are not willing to remake the topography of the banking system in such a fashion. Nor, apparently, is Congress, which has directed the courts to void unrecorded agreements against the interests of FDIC–Receiver without regard to malfeasance. *See* FIRRE Act, *supra* note 3 (recent amendments to *D'Oench's* statutory counterpart, 12 U.S.C. § 1823(e)). Accordingly, we reaffirm our earlier holdings: the *D'Oench, Duhme* doctrine is applicable even in the absence of malfeasance.

I would reverse and render. Being in the minority, I respectfully dissent.